85 P.3d 346 (2004)
151 Wash.2d 60
SANE TRANSIT, a Washington non-profit corporation, and Mark Baerwaldt, for themselves and on behalf of taxpayers, Appellants,
v.
SOUND TRANSIT, officially known as the Central Puget Sound Regional Transit Authority, a Washington municipal corporation, Respondent.
No. 73413-5.
Supreme Court of Washington, En Banc.
Argued June 10, 2003.
Decided March 4, 2004.
*347 Helsell Fetterman Martin et al., Bradley H. Bagshaw, David Jurca, Connie Haslam, Seattle, for appellants.
Paul J. Lawrence, Central Puget Sound Regional Transit, Desmond Brown, Seattle, for respondent.
Sheila Marie Gall, Olympia, for Amicus Curiae (Association of Wash. Cities).
Thomas William Kuffel, Noel Reynolds Treat, Seattle, for Amicus Curiae (King County).
ALEXANDER, C.J.
We have been asked to overturn a decision of the King County Superior Court in which that court dismissed an action by Sane Transit, a Washington nonprofit corporation, and Mark Baerwaldt (collectively "Sane Transit"). In that action Sane Transit sought to enjoin Sound Transit from expending funds collected from local taxes for construction of a 14-mile light rail line from downtown Seattle to Tukwila. Sane Transit contends that the planned light rail line is an unlawful "substantial deviation" from a planned 21-mile light rail line that had been approved by voters. We affirm the trial court, holding that when the voters approved the implementation of a regional transportation system they granted Sound Transit the discretion to scale back the light rail project in the event of unforeseen circumstances.

I
In 1992, the Washington Legislature authorized any two or more contiguous counties with populations of 400,000 or more to create a regional transit authority to address traffic congestion. Shortly thereafter, the legislative bodies of the counties of Snohomish, King, and Pierce each passed a resolution *348 establishing Sound Transit (officially known as the Central Puget Sound Regional Transportation Authority).[1] It was invested with the authority to design and implement a high capacity transit system in a "service area" (hereinafter referred to as Sound Transit's "district") within those counties. RCW 81.112.030(1), .050(1); see also Clerk's Papers (CP) at 340. Sound Transit's district boundary stretches generally from Dupont in Pierce County to Everett in Snohomish County, and from the eastern edge of Puget Sound in the west to Issaquah in east King County. It is governed by an 18-person board whose membership is comprised of the Washington Secretary of Transportation and elected officials from Snohomish, King, and Pierce Counties.
After the voters rejected Sound Transit's 1995 proposal for a $6.9 billion, 16-year regional transit plan, Sound Transit promulgated a second, less ambitious plan in May 1996. This plan, entitled "Sound Move: The Ten-Year Regional Transit System Plan" ("Sound Move"), was envisioned to encompass 10 years of planning and construction at a cost of $3.9 billion (in 1995 dollars) to complete. See CP at 14-57; Decl. of Joni Earl, Ex. B. The plan consisted of four primary projects: a high-occupancy-vehicle (HOV) expressway, a system of regional express buses, commuter rail (the "Sounder"), and electric light rail.
The plan envisioned a 21-mile electric light rail line running from Seattle's University District to the Seattle-Tacoma International Airport in the City of SeaTac. The line was to run through downtown Seattle and the Rainier Valley neighborhood in south Seattle on its way to the airport. An extension of the light rail line further north to the Northgate shopping center was envisioned, but only if sufficient funds remained after construction of the line from the University District to the airport.[2] The cost of constructing the 21-mile light rail line was estimated at $1.8 billion (in 1995 dollars).
In August 1996, Sound Transit passed "Resolution No. 75" which authorized submission of Sound Move to the voters for their consideration. CP at 413-26. The proposition, called "Proposition 1," provided for a 0.4 percent sales and use tax increase and a 0.3 percent increase in the motor vehicle excise tax for the residents within the Sound Transit district. CP at 415. The money generated by the imposition of these taxes was to be the primary source of funds for the planning, development, operation, and maintenance of the planned projects set forth in Sound Move.[3] As required by statute, the voting public was provided with an 8-page pamphlet that summarized the 36-page (plus appendices) Sound Move plan.[4] The pamphlet was also entitled "Sound Move: The Ten-Year Regional Transit System Plan." Decl. of Joni Earl, Ex. E. Voters also received a voters' pamphlet which included the ballot title, a brief explanatory statement, and statements for and against the measure. The voters' pamphlet also indicated that the complete text of the measure could be reviewed at the auditor's office of the county in which the voter resided.[5] Resolution 75 was the measure on file with those offices.
The ballot title for Proposition 1 on the November 5, 1996, general election ballot stated:

*349 To implement a regional rail and express bus system linking Tacoma, Seattle, Bellevue, Everett, other cities, and Sea-Tac airport, shall the Regional Transit Authority impose a sales and use tax of up to four-tenths of one percent and a motor vehicle excise tax of three-tenths of one percent to provide the local share of funding towards the $3.9 billion estimated cost of the system, as provided in Resolution 75 and the "Ten-Year Regional Transit Plan"?
CP at 60. A majority of the voters in the Sound Transit district approved Proposition 1.[6]
By September 2000, Sound Transit became aware that, due to unforeseen circumstances, it would not be able to construct the light rail line within a 10-year period and within the estimated budget.[7] Sound Transit now estimated the cost of constructing the 21-mile light rail line at $2.5 billion (in 1995 dollars), rather than the original estimated $1.8 billion (in 1995 dollars). By April 2001, Sound Transit concluded that the estimated cost of completing the proposed light rail line had risen even further to $4.164 billion.
On November 29, 2001, faced with the specter of increased construction costs, Sound Transit adopted a resolution that scaled the light rail project down to a 14-mile light rail line running from downtown Seattle to Tukwila with a bus shuttle from the City of Tukwila to Seattle-Tacoma International Airport. The resolution authorized construction to begin in 2002 with a projected 2009 completion date. The cost of constructing the 14-mile line was estimated at approximately $1.5 billion in 1995 dollars, or approximately $2.07 billion in year of expenditure dollars. Following adoption of the plan calling for a shortened light rail line, Sound Transit indicated its intent to extend the line to complete substantial portions of the additional planned 7 miles of line, either north to the University District or south to the airport, with the remaining $1.2-$1.4 billion it anticipated it would have following construction of the 14-mile line.
Sound Transit's adoption of the plan for a scaled back light rail line prompted Sane Transit to file an action against Sound Transit in King County Superior Court. In its action Sane sought a declaratory judgment that construction of a 14-mile line over a 13-year period was an unlawful substantial deviation from the project approved by the voters. Sane Transit also requested an injunction preventing Sound Transit from spending local taxes on the scaled back 14-mile light rail line and an order barring Sound Transit from using taxpayer funds to build the light rail line. After consideration of Sane Transit's motion for summary judgment, as well as Sound Transit's cross motion for dismissal, the superior court concluded that although it was undisputed that the modifications to the light rail line "substantially deviated" from the adopted plan, the voters had granted Sound Transit the discretion to construct a shortened light rail line. It concluded that both Resolution 75 and the eight-page summary brochure were instructive in determining the voters' intent, and that they "must be read together for purposes of determining the scope of authority of Sound Transit." CP at 855. Based on the language in Resolution 75 authorizing Sound Transit to make certain changes to the Sound Move project, as well as the conclusion that the eight-page brochure did not guarantee the project would be completed "`on time, on budget,'" the trial court dismissed Sane Transit's action with prejudice. CP at 856. Sane Transit sought direct review of that ruling in this *350 court and we granted its petition. Sane Transit also requests that we grant it reasonable attorney fees.

II
We review the trial court's decision on cross motions for summary judgment de novo. Berger v. Sonneland, 144 Wash.2d 91, 102-03, 26 P.3d 257 (2001); Citizens for More Important Things v. King County, 131 Wash.2d 411, 415, 932 P.2d 135 (1997). A motion for summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." CR 56(c).
The broad question before us is whether Sound Transit's adoption of a scaled back light rail line that will take more than 10 years to complete was an unlawful substantial deviation from the plan approved by the voters. This question must be viewed in light of established law in Washington that when voters approve taxes for a public project any major deviation to the project is not within the government's lawful power. O'Byrne v. City of Spokane, 67 Wash.2d 132, 136-37, 406 P.2d 595 (1965); Davis v. City of Seattle, 56 Wash.2d 785, 789-90, 355 P.2d 354 (1960); George v. City of Anacortes, 147 Wash. 242, 244-46, 265 P. 477 (1928); Hayes v. City of Seattle, 120 Wash. 372, 374-75, 207 P. 607 (1922); Thompson v. Pierce County, 113 Wash. 237, 241, 193 P. 706 (1920). While minor details in a public project may be changed by the governing agency, taxpayer funds may not be used to construct a substantially different project than the one approved by voters. See O'Byrne, 67 Wash.2d at 136-37, 406 P.2d 595; Davis, 56 Wash.2d at 789-90, 355 P.2d 354; George, 147 Wash. at 244-46, 265 P. 477; Thompson, 113 Wash. at 241-42, 193 P. 706.

A. The length of the light rail line
There is no disagreement that the reduced 14-mile light rail line is a substantial deviation from the 21-mile light rail line approved by the voters. The trial court so found, and Sound Transit does not dispute that conclusion. Sound Transit contends, however, that the deviation is not unlawful because, in its view, the voters granted it the discretion to scale back the light rail project if funding for its construction should prove to be insufficient. It argues, therefore, that although most major deviations from a voter approved public project are prohibited, the deviation in this case is not.
We agree that the significant question is not whether the shortened light rail line is a substantial deviation from the proposed plan approved by the voters. Rather, it is whether the deviation was lawful because the voters granted Sound Transit discretion to change the plan. As we stated in Hayes, "[t]he question is one of construction of contract, and that contract is expressed in the original ordinance. If the terms of that instrument do not permit the proposed change, then it cannot be made, regardless of the advantages which might result." Hayes, 120 Wash. at 375, 207 P. 607. It is clear that the corollary principle is also true: if the "contract" approved by voters authorizes substantial deviations to a project under particular circumstances, then the agency may lawfully make such changes.
Sound Transit relied upon language in Resolution 75 in wielding its discretionary authority. That resolution, as we have observed, was adopted in 1996. It incorporated the Sound Move plan and directed that voters in the Sound Transit district consider the plan and approve local taxes for its implementation. As we conclude below, Resolution 75 was the enabling legislation for the Sound Move project, and it was the measure approved by the voters. Sound Transit relied on section 2 of Resolution 75 in making its decision to construct a 14-mile light rail line over the course of 13 years. Section 2 of the resolution provides that
In the event that the proceeds of federal contributions, plus any other moneys of the RTA [Regional Transportation Authority, Sound Transit] legally available, are insufficient to accomplish all of the capital improvements provided by this Resolution, the RTA shall use the available funds for paying the cost of those improvements that are contained in the Ten-Year Regional Transit System Plan and are deemed by *351 the Board to be most necessary and in the best interests of the RTA after consideration of the financial policies approved by Resolution No. 72. In the event that the Ten-Year Regional Transit System Plan improvements, or some portion thereof, are impractical to accomplish due to changed conditions or force majeure events, the RTA may use the available funds to pay principal of or interest on bonds, to reduce tax levies, or to pay for other capital and/or service improvements that achieve the stated goals of said plan, as the Board in its discretion shall determine as appropriate or necessary in accordance with law and Board policy.

CP at 415 (emphasis added). Both Resolution 72 and Appendix B to the Sound Move plan, incorporated by Resolution 75, provide that where "actual and projected expenditures exceed [the] actual and projected revenues and funding sources by 5 percent or greater, and/or where unforeseen circumstances occur which would result in an inability to substantially complete projects within [the] plan," the Board is required to
take one or more of the following actions:
 Correct the shortfall through use of such... uncommitted funds and/or bond capacity which is available ...; and/or
 Scale back the ... plan or projects within the plan to match a revised budget; and/or
 Authorize a vote of the RTA District on a revised ballot measure.
Decl. of Joni Earl, Ex. B App. B at B-4. Sound Transit claims that the 14-mile light rail line is a scaled back version of the 21-mile light rail line that it adopted due to unforeseen costs.
Sane Transit responds that Sound Transit could not scale back the light rail line project because the full text of Resolution 75 was not sent to the voters or included in the official voters' pamphlets distributed by the counties. It contends that the voters were unaware they were granting any such discretion to Sound Transit and could not have approved Resolution 75. It urges that the trial court erred in concluding otherwise.
We disagree. Sane Transit relies upon the principle that acts approved by the people are construed by focusing on the language of the proposal as the average informed voter would read it. See Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000); State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n, 140 Wash.2d 615, 637, 999 P.2d 602 (2000); City of Spokane v. Taxpayers of City of Spokane, 111 Wash.2d 91, 98, 758 P.2d 480 (1988). In cases where voters are not provided with the full text of the measure to be voted upon, Sane Transit would have us ignore the language of the measure and attempt to construe the measure based on extrinsic documents sent to the voters which the average informed voter may or may not have read. An inquiry into the voter's subjective understanding of what he or she thought he or she was enacting is a task we will not undertake. See generally Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762 (inquiry into the voters' intent will not occur where the text of an initiative is unambiguous); City of Spokane, 111 Wash.2d at 97, 758 P.2d 480 (court will avoid entering the realm of pure speculation about what individual voters were thinking, nor will it assume voters do not read or understand the measure presented to them).
Reference to the statutes governing placement of a proposal for a high-capacity transportation system on a ballot leads us to conclude that Resolution 75 was the approved proposal. RCW 29.79.035(1) requires the ballot title to contain a concise description which "must ... clearly identify the proposition to be voted on." See also RCW 29.27.066. RCW 81.104.140(7) requires reference in the ballot title to the summary pamphlet sent to voters. In order for the ballot title, which has not been challenged, to comply with these statutes, it must be concluded that Resolution 75 is the identified proposition and the eight-page "Sound Move: The Ten-Year Regional Transit System Plan" is the summary pamphlet sent to voters.
We have previously indicated that where the ballot title would lead to an inquiry into the body of the act, proper notice, as required *352 by article II, section 19 of the Washington Constitution, has been given to the voter about what he or she is deciding. Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 555, 901 P.2d 1028 (1995). Similarly in this case, although Sane Transit claims that the voters did not realize which proposal they were voting on, the ballot title informed the voters that Resolution 75 was the proposal to be enacted, and the resolution was available for consideration by request to the office identified in the voters' pamphlet.
Sane Transit further argues that reliance on the ballot title does not satisfy the requirement in article II, section 1(e) of the Washington Constitution that the voters be allowed to "study the measures prior to election." The requirements of article II, section 1(e) of the Washington Constitution are implemented by chapter 29.81 RCW which governs the voters' pamphlet. Wash. Fed'n of State Employees, 127 Wash.2d at 553, 901 P.2d 1028. Sane Transit does not challenge the voters' pamphlet. It does, however, contend that Resolution 75 is not the enabling legislation for the Sound Move project because the full text of the resolution was not set forth in the voters' pamphlet.
Sane Transit's argument is unpersuasive. The voters' pamphlet was required to contain "[t]he text of each measure." RCW 29.81A.040(3); see also RCW 81.104.140(9) (requiring a voters' pamphlet). If the word "text" in RCW 29.81A.040(3) means full text as Sane Transit suggests, then the voters' pamphlet was invalidly drafted because it did not include the full text of any proposed legislation.[8] We reject Sane Transit's argument, concluding that RCW 29.81A.040(3) is unhelpful because the voters' pamphlet did not set forth the full text of any legislation. Moreover, the validity of the voters' pamphlet is not before us because Sane Transit is not challenging its validity nor could it as the time period for contesting it has long passed.[9] Instead, we agree with the trial court's conclusion that the voters' pamphlet and the summary pamphlet were not sufficient to inform the voters of the detailed aspects of a multibillion dollar transportation and financing plan, and could not be considered enabling legislation.[10] Resolution 75 which provides those details is the legislation adopted by the voters.
Justice Sanders's dissent asserts that if Resolution 75 were the legislation adopted by the voters, then only that portion of the resolution authorizing an "increase in sales taxes and motor vehicle excise taxes" was adopted. Dissent of Sanders, J., at 365. As noted above, the legislation adopted by the voters must be sufficient in detail. The only document with sufficient detail for enabling legislation is Resolution 75, and even Resolution 75 is sufficient only when it is viewed in its entirety.[11]
*353 As set out above, section 2 of Resolution 75 recognized that taxpayer funds might exceed anticipated costs or that revenues might be insufficient, and directed the agency to take certain action in either event. Where funds were insufficient, Sound Transit was authorized to use the available funds "to pay for other capital and/or service improvements that achieve the stated goals of [the Ten-Year Regional Transit System] plan, as the Board in its discretion shall determine as appropriate or necessary," including scaling back the scope of an individual project in the 10-year plan. CP at 415. We conclude, therefore, that Sound Transit acted within its authority in adopting a plan for a 14-mile light rail line.

B. Construction of the light rail line and collection of local taxes beyond the 10-year period
Sane Transit asserts, additionally, that even if the voters adopted Resolution 75 and authorized Sound Transit to scale back the light rail line project, Sound Transit's plan to extend the construction period beyond the 10-year period and to collect taxes beyond that 10-year period to finance the construction is an unlawful substantial deviation that is not authorized by the discretionary authority granted in Resolution 75.[12] Sane Transit indicates in this regard that Sound Transit assured voters the Sound Move project would take only 10 years by calling it "The Ten-Year Transit System Plan."
Sane Transit's argument does not, however, find support in the measure approved by the voters. Resolution 75 does not itself state any limits on the construction or taxation period.[13] Instead, it instructs the agency to construct those projects in the Sound Move plan that are feasible with the funds raised by the voter approved local taxes. In the event of insufficient funds, Resolution 75 requires Sound Transit to pay for the costs of the improvements "deemed ... to be most necessary" and in the best interests of the project. CP at 415 ("[T]he RTA shall use the available funds for paying the cost of those improvements that are contained in the Ten-Year Regional Transit System Plan....").
Neither does the information received by the voters support Sane Transit's argument. The summary brochure mentions the 10-year period only two times. One reference states that the University District to the Northgate shopping center "segment would be built during the ten-year plan period only if additional funding is available." CP at 301. Another states "[t]he RTA Board is committed to completing Sound Move within ten years of voter approval." CP at 303. Neither of these references constitutes more than a pledge to complete the project on time.
It is true that references to the construction time period in the more detailed version of Sound Move indicate a serious commitment to completion of the project within ten years. The following statements are examples of references to the 10-year period set forth in the Sound Move plan:
System completion within ten yearsdifferent parts and segments of the plan will be implemented in stages and be operational as soon as possible; the entire system will be completed and operational within ten years.

CP at 26 (emphasis added).
The ten-year timeframe for putting the plan in place begins the day after voters approve funding for the new regional transit system....

*354 ... [T]he entire system should be up and running within 10 years.... [T]he RTA will use a variety of techniques to make sure that the system is developed and operated as cost-effectively as possible.
CP at 45 (emphasis added).
The proposal to be placed before the voters will be a ten-year construction plan financed in part by long-term bonds. As elements are completed, they will begin operating during that ten-year period. After the ten-year period, the RTA's tax revenues will be used to continue transit operations and pay for debt service....
The RTA is committed to building and operating a ten-year system plan that can be confidently funded and completed as promised to the region's citizens.
CP at 52.
[T]en-year implementationDifferent parts and segments of the plan will be implemented in stages and be operational as soon as possible. The RTA is committed to the entire system being completed and operational within 10 years.
CP at 53.
Sound Transit argues that these and other similar statements were merely declarations of the principles of the plan. We agree with Sound Transit's characterization of the above statements. Declarations of principles, purposes, and aims are not operative rules of action and do not give rise to enforceable rights or create legal obligations. See Melville v. State, 115 Wash.2d 34, 38, 793 P.2d 952 (1990); Int'l Union of Operating Eng'rs Local No. 286 v. Sand Point Country Club, 83 Wash.2d 498, 505, 519 P.2d 985 (1974); Whatcom County v. Langlie, 40 Wash.2d 855, 863, 246 P.2d 836 (1952). We conclude, therefore, that there is no legal obligation under the statements in the Sound Move summary brochure or the detailed Sound Move plan for Sound Transit to complete the light rail line within ten years. Pursuant to the language in Resolution 75, Sound Transit must complete the project to the extent possible based on the funds available.
Insofar as continuing the local taxes, Sane Transit claims that the imposed sales and use, and motor vehicle taxes were also restricted to a 10-year collection period. Sound Transit responds that the taxes are permanent and for the construction, operation, and maintenance of the projects in the Ten-Year Regional Transit System Plan. In sections 3 and 4 of Resolution 75, the Sound Transit Board stated:
For the sole purpose of providing funds for the planning, development, operation, and maintenance of a high capacity transportation system ... the RTA shall levy and collect a sales and use tax not to exceed four-tenths of one percent and levy and collect a motor vehicle excise tax of three-tenths of one percent ... if such local option taxes are approved by the voters within the RTA boundaries....
.... The Board intends for the levy and collection of the motor vehicle excise tax and the sales and use tax to begin on January 1, 1997.
CP at 415 (emphasis added). This language indicates that the board intended to continue taxation beyond the projected 10-year construction period. Language in the full-length detailed Sound Move document also supports this conclusion.
System expansion or tax rollbackAny second phase capital program which continues local taxes for financing will require voter approval within the RTA District. If voters decide not to extend the system, the RTA will roll back the tax rate to a level sufficient to pay off the bonds and operate and maintain the investments made as part of Sound Move.
CP at 26.
Any second phase capital program which continues local taxes for financing will require approval by a vote of those ... within the RTA District.
CP at 52.
Because transit facilities provide benefits over a long span of time, it is reasonable to finance their construction over a period *355 that extends beyond the ten-year system plan construction timeframe.

CP at 53 (emphasis added).
System expansion or tax rollbackAny second phase capital program which continues local taxes for financing will require voter approved [sic] within the RTA District. If voters decide not to extend the system, the RTA will roll back the tax rate to a level sufficient to pay off the outstanding bonds and operate and maintain the investments made as part of Sound Move.
CP at 56.
In the financial policies appendix to Sound Move, the board indicated:
Voter approval requirement
The RTA Board recognizes its authority to fund Sound Move's future operations, maintenance and debt service as well as any future phase capital program through a continuation of the local taxes initially authorized by the voters. However, in its commitment to public accountability, the RTA Board pledges that any second phase capital program which continues local taxes for financing will require approval by a vote of those citizens within the RTA District.
Sales tax rate rollback
Should voter approval for a future phase capital program not be forthcoming, the RTA Board will initiate two steps to roll back the rate of sales tax collected by the RTA.
a) First, the RTA will first [sic] initiate an accelerated pay off schedule for any outstanding bonds. Second, the RTA will implement a tax rollback to a level necessary to pay the accelerated schedule for debt service on outstanding bonds, system operations and maintenance, fare integration, capital replacement, and agency cost.
b) Once all debt is retired, the RTA will implement a tax rollback to a level necessary to pay for the system operations and maintenance, fare integration, capital replacement and agency administration.
Decl. of Joni Earl, Ex. B App. B at B-7.
It is apparent from the language contained in Resolution 75 and in Sound Move and its appendices that when the voters approved the Ten-Year Regional Transit System Plan they implemented permanent taxes. At a minimum, taxes were to be collected beyond the 10-year period for operations and maintenance of the system, fare integration, capital replacement, and agency administration. It was also expected that taxes for construction costs would extend beyond the 10-year period. The only limitation on the collection of taxes for construction was that they not be collected on a second or any future capital phase without further voter approval. In sum, Sound Transit has the authority to continue to collect taxes within its district to finance construction beyond the 10-year period, as well as for operation and maintenance of the system.
Finally, Sane Transit asserts that the 14-mile light rail line is an unlawful substantial deviation from the plan approved by the voters because a grant of discretionary authority to the agency in Resolution 75 subverts the legislative purpose behind RCW 81.104.100(2)(d)[14] and RCW *356 81.104.140(7).[15] These statutes required Sound Transit to inform the voters of the details of the system and financing plan. Sane Transit claims the purpose of these statutory requirements was to entitle the voters to make the decision of whether the benefits of Sound Transit's proposal outweighed its costs. Sane Transit further asserts that a governmental authority cannot retain the type of discretion claimed by Sound Transit for a publicly funded project.
Sane Transit relies on Uhler v. City of Olympia, 87 Wash. 1, 151 P. 117, 152 P. 998 (1915), for the proposition that the discretionary authority set forth in section 2 of Resolution 75 deprived the voters of the statutory right to determine whether the benefits of the light rail plan warrant its costs. In Uhler, this court concluded that it would not allow a city council to increase the necessary sum of bonds to be issued from $90,000 to an amount of at least 10 percent more by allowing for the city to pass a supplemental ordinance raising the amount. Uhler, 87 Wash. at 16-17, 152 P. 998. In reaching this conclusion, we relied upon a statute which compelled a reasonably definite estimate of the value. In this case, Sound Transit has not changed the tax rates approved by the voters. Further, by constructing a shortened light rail line based on its authority to scale back a project to remain within budget, Sound Transit has not violated the voters' statutory right to pass upon the question of taxation. The discretionary authority in section 2 of Resolution 75 instead provides the agency with guidance regarding what action should be taken in the situation where funds are insufficient and/or changed circumstances occur.[16] The record further indicates that Sound Transit complied with RCW 81.104.100(2)(d) and RCW 81.104.140(7) when it mailed an eight-page summary pamphlet of the system and financing plan to every registered voter. The voters had the opportunity to deliberate over the summary of the plan which was sent to them. In addition, there is nothing in the record that indicated voters were denied the opportunity to examine the details of the plan, and consideration of Resolution 75 was available to them. The discretion granted to Sound Transit in section 2 of Resolution 75 is, therefore, not unlawful.

III
Sane Transit seeks reasonable attorney fees under the common fund doctrine. Attorney fees, however, will not be awarded where the suit brought by a party fails to *357 preserve, protect, or create a common fund which benefits a group of others in addition to the plaintiff because it is unsuccessful. Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 542, 585 P.2d 71 (1978); Grein v. Cavano, 61 Wash.2d 498, 505, 379 P.2d 209 (1963). In light of our conclusion that Sound Transit was authorized to scale back the light rail line and continue construction and taxation beyond a 10-year period, Sane Transit is not entitled to fees. Its request is, therefore, denied.

IV
In conclusion, we affirm the trial court's order dismissing Sane Transit's action with prejudice. We hold that when the voters approved the implementation of a regional transportation system they approved Resolution 75 which granted Sound Transit the discretionary authority to scale back the light rail line from 21 miles to a 14-mile line because unforeseen circumstances and changes in conditions resulted in insufficient funds. We further hold that Sound Transit is not restricted to constructing the light rail line within a 10-year period, which concludes in 2006, and may continue the sales and use tax of up to four-tenths of one percent and a motor vehicle excise tax of three-tenths of one percent approved by the voters. We deny Sane Transit's request for attorney fees.
WE CONCUR: MADSEN, IRELAND, BRIDGE, OWENS and FAIRHURST, JJ.
SANDERS, J. (dissenting).
We must determine whether Sound Transit may construct a light-rail line one-third shorter[1] over a period 30 percent longer than promised to the voters.[2] I submit the answer lies in the measure adopted by the voters. And the answer is no.
Ultimately, the question is what authority the voters of the regional transit district delegated to Sound Transit. Three documents are relevant: (1) the eight-page brochure describing the systems plan sent to the voters as required by RCW 81.104.140(8); (2) the local voters pamphlet prepared according to RCW 81.104.140(9) and former RCW 29.81A.040 (1984) (recodified at RCW 29A.32.240 by LAWS OF 2003, ch. 111, § 816); and (3) Resolution 75 (including all of its incorporated provisions).
Any analysis of voter intent must necessarily begin with what legislation the voters adopted, i.e., what was actually presented to the voters. See Louthan v. King County, 94 Wash.2d 422, 430, 617 P.2d 977 (1980) ("What is authorized depends upon what is submitted to the electorate."); Amalgamated Transit Union Local 587 v. State, 142 Wn.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000) ("In determining intent from the language of the statute, the court focuses on the language as the average informed voter voting on the initiative would read it."). Consequently, the analysis initially focuses on the eight-page brochure describing the plan mailed to each voter as required by the special high-capacity transportation statute.
I. The Eight-Page Brochure Mailed to the Voters Is the Measure Adopted By the Voters.
We have consistently followed the principle that government agencies may not substantially deviate from building the project approved by the voters. See O'Byrne v. City of Spokane, 67 Wash.2d 132, 136, 406 P.2d 595 (1965); George v. City of Anacortes, 147 Wash. 242, 245, 265 P. 477 (1928); Hayes v. City of Seattle, 120 Wash. 372, 375, 207 P. 607 (1922); Thompson v. Pierce County, 113 Wash. 237, 241, 193 P. 706 (1920). And we construe taxing initiatives and propositions "as the average informed lay voter would read" them. In re Estate of Hitchman, 100 Wash.2d 464, 467, 670 P.2d 655 (1983).
A. High-Capacity Transportation System Planning Is a Unique Process That Requires Unique Notification to the Voters.
Chapter 81.104 RCW provides the exclusive and mandatory procedure a regional transit authority must follow to seek voter *358 approval for increased taxation to build a high-capacity transportation system. This procedure is unique and distinct from normal proposition measures submitted to the voters. Cf. RCW 17.28.252 (mosquito control districts); RCW 27.12.222 (rural county library districts); RCW 28A.540.060 (school districts).
In 1991 the legislature enacted Engrossed Substitute House Bill 2151, which, inter alia, amended various sections within chapter 81.104 RCW. See LAWS OF 1991, ch. 318, §§ 1-12. The bill's primary focus was to differentiate between various aspects of the planning process, namely system planning, project planning, and finance planning. See id. §§ 9-10 (codified as amended at RCW 81.104.100-.110).[3] While project planning involved specific details, see RCW 81.10.100(3), the system plan must contain specific elements:
(d) The system plan submitted to the voters pursuant to RCW 81.104.140 shall address, but is not limited to the following issues:
(i) Identification of level and types of high capacity transportation services to be provided;
(ii) A plan of high occupancy vehicle lanes to be constructed;
(iii) Identification of route alignments and station locations with sufficient specificity to permit calculation of costs, ridership, and system impacts;
(iv) Performance characteristics of technologies in the system plan;
(v) Patronage forecasts;
(vi) A financing plan describing: Phasing of investments; capital and operating costs and expected revenues; cost-effectiveness represented by a total cost per system rider and new rider estimate; estimated ridership and the cost of service for each individual high capacity line; and identification of the operating revenue to operating expense ratio.
The financing plan shall specifically differentiate the proposed use of funds between high capacity transportation facilities and services, and high occupancy vehicle facilities;
(vii) Description of the relationship between the high capacity transportation system plan and adopted land use plans;
(viii) An assessment of social, economic, and environmental impacts; and
(ix) Mobility characteristics of the system presented, including but not limited to: Qualitative description of system/service philosophy and impacts; qualitative system reliability; travel time and number of transfers between selected residential, employment, and activity centers; and system and activity center mode splits.
RCW 81.104.100(2)(d) (emphasis added). The phrase "but is not limited to" necessarily permits full disclosure of all other material terms submitted to the voters within or beyond the mandatory elements delineated in RCW 81.104.100(2)(d).
As one of those elements is a "financing plan," RCW 81.104.100(2)(d)(vi), subsumed within that element is what contingencies or qualifications, if any, the transit authority might make in the event of insufficient funding. Terms which reserve a discretionary power are generally unlawful unless disclosed up front. See Thompson, 113 Wash. at 241, 193 P. 706.
Most importantly for the issue at hand, ESHB 2151 added what is now RCW 81.104.140(8). See LAWS OF 1991, ch. 318, § 11. That section imposes an express duty upon the regional transit authority seeking dedicated funding for a high-capacity transportation *359 system to mail a document (brochure) descriptive of the plan to each registered voter in the designated area:
(8) Agencies shall provide to the registered voters in the area a document describing the systems plan and the financing plan set forth in RCW 81.104.100. It shall also describe the relationship of the system to regional issues such as development density at station locations and activity centers, and the interrelationship of the system to adopted land use and transportation demand management goals within the region. This document shall be provided to the voters at least twenty days prior to the date of the election.
RCW 81.104.140(8). This requisite statutory disclosure of the systems plan requires a mailing to the voters setting forth at least the major elements required in the systems plan, which necessarily includes, at the very least, a description of the physical location of the planned improvement, and a time frame for its construction. See RCW 81.104.100(2)(d)(iii), .100(2)(d)(vi),.100(2)(d)(viii).
Nothing in RCW 81.104.140(8) indicates the legislature desired anything less than full disclosure to the electorate of at least the essentials of the system plan. And obviously the section would be meaningless if the transit authority were allowed to affirmatively misrepresent the plan. While the transit authority need not spell out the details of the project plan, it is required to describe the material terms to the system plan, which certainly includes the length and location of the proposed facilities as well as the completion date. RCW 81.104.100(2)(d)(iii),.100(2)(d)(vi), .100(2)(d)(viii). This brochure did exactly that. The eight-page brochure Sound Transit mailed to the voters pursuant to statute is, as a matter of law, a descriptive summary of the actual plan submitted to the voters for adoption. And, as a matter of law, it is what the voters voted on.
B. The Plan Submitted to the Voters Pursuant to Statute Unequivocally and Unconditionally Promised a Light-Rail Line From the University District to Sea-Tac in 10 Years.
The eight-page document identified itself as "[a] proposal to the citizens by the Regional Transit Authority," Clerk's Papers (CP) at 297 (emphasis added), representing itself as the citizen's "guide to the Central Puget Sound Regional Transit Authority's proposal to increase our transportation system capacity by offering new choices for getting around the region." Id. The document specifically referenced itself as the document required by RCW 81.104.140(8).
The brochure unequivocally and without qualification promised "25 miles of light-rail with 26 stations within walking distance of major regional destinations." CP at 300.[4] Some of the major destinations expressly included:
 Educationthe University of Washington, the UW Tacoma Campus, Seattle Central Community College, Seattle University and potentially North Seattle Community College.
 Health carethe UW Medical Center, Swedish Hospital, Harborview and Virginia Mason.
 Cultural, convention and sports facilitiesthe Seattle Art Museum, the Tacoma Theater District, the new Washington State History Museum, Husky Stadium, the Kingdome, the Tacoma Dome, the Washington State Convention & Trade Center, Seattle Center (via Monorail connection) and Benaroya Hall (the new Seattle Symphony hall).
 Other transportationSea-Tac Airport, Colman Dock (the Washington State Ferries), King Street Station (commuter rail and Amtrak), the Monorail, Seattle's Waterfront Streetcar and a Tacoma Dome regional transportation terminal.
Id. Sound Transit expressly assured voters in this brochure the light-rail would run "from *360 downtown Seattle to the University District (the second largest employment center and transit market in the region) through First Hill and Capitol Hilltwo of the largest transit markets in the region." CP at 301.
The brochure was represented by Sound Transit as a "Ten-Year Regional Transit System Plan," CP at 297, made on express representations that Sound Transit was "committed to completing [the project] within ten years of voter approval," CP at 303.
Yet in a shocking turn of events those voters in the University District, First Hill, Capitol Hill, and Sea-Tac who voted in justified reliance on the statutory brochure to be taxed for Sound Transit to construct a means of traveling to and from the expressly listed destinations were betrayed. They are now faced with the reality these destinations are not to be served at all. Nothing in the mailed brochure self-identified as the "proposal to the citizens," CP at 297, alerted them to this possibility in any way, shape, or form. Moreover, the brochure expressly stated exactly the opposite. Indeed, a voter examining the eight-page brochure would see that Sound Transit would service the area designated without qualification. Even the financing was guaranteed:

An independent expert review panel appointed by the governor and the state Legislature has stated that Sound Move ridership and cost estimates are conservative.

Project costs and revenues for Sound Move have been carefully estimated to provide a cushion in case there are unforeseen expenses or changes in revenues.
. . . .
Sound Move ten-year estimates include all costs to build and run the system including community planning, engineering, design, environmental mitigation, full accessibility, safety features, station amenities, and a contingency for unforeseen expenses.

CP at 303 (emphasis added). There was no hint of shortfalland there were express representations to the contrary! Nowhere did the eight-page brochure state or imply Sound Transit's service plan would or could be scaled back at all, much less by one-third.
Relying on this brochure, no voter could possibly have suspected Sound Transit had a hidden agenda to scale back the project and extend its time of completion should it run out of money, an eventuality which was expressly disclaimed in and of itself. The plan described in this brochure unequivocally, unconditionally, and categorically promised the voters Sound Transit would have more than enough money to build 21 miles of light-rail from the University District to Sea-Tac in 10 years. There was no mention of Resolution 75 in fact, form, or substance. That Sound Transit elected to withhold any hint of its now asserted discretionary power from the voters in the eight-page brochure means that alleged discretionary power was neither submitted to nor possibly approved by the voters. The failure to include this purported reserved discretion precludes its existence as a matter of law as the voters could not approve a power that was never submitted to them, and one which could substantially change the whole system submitted for approval. Louthan, 94 Wash.2d at 430, 617 P.2d 977. Voters simply could not, and did not, approve something substantially different than what was expressly and without qualification represented in the statutory plan brochure.
Necessary to the majority's holding is its claim the voters pamphlet and the eight-page brochure "were not sufficient to inform the voters of the detailed aspects of a multi-billion dollar transportation and financing plan, and could not be considered enabling legislation." Majority at 352 (emphasis added). If we were speaking only of "details" the majority might have a point. But, to the contrary, we are talking about direct and unqualified representations that go to the heart of the plan, i.e., "[t]he plan includes 25 miles of light-rail," CP at 300, and that Sound Transit would complete the project "within ten years of voter approval," id. at 303. These were the very features that distinguished it from the prior plan rejected by the voters.
In sum, the legislature mandated the regional transit authority to submit to the voters a description of the system it proposed to build. RCW 81.104.140(8). Sound Transit *361 did just that, and the voters were entitled to rely upon the unconditional, unqualified, and unequivocal promises Sound Transit made for a "north-south light-rail system" running from the University District to Sea-Tac, CP at 300, that would be "complet[ed] ... within ten years of voter approval," id. at 303. If Sound Transit had a secret agenda, that agenda was never submitted to, much less adopted by, the electorate. This should end the case.
II. The Voters Pamphlet Buttresses the Conclusion That Sound Transit Would Unconditionally Build a 21-Mile Light-Rail Line in 10 Years.
Although the aforementioned statutory proposal/brochure is legally dispositive of what the voters actually adopted, the voters pamphlet[5] is not to the contrary. Like the "document describing the systems plan and the financing plan," RCW 81.104.140(8), Sound Transit was required to produce and submit to the voters a "local voter's pamphlet." RCW 81.104.140(9) (emphasis added). Sound Transit did not produce a local voters pamphlet but rather included its proposition in a statewide voters pamphlet.
It may be appropriate to consider the language in the voters pamphlet for ascertaining voter intent when the language of the proposed initiative is ambiguous. Amalgamated Transit, 142 Wash.2d at 205-06, 11 P.3d 762. When ambiguous as to what the proposed initiative actually is, "arguments made in pamphlets for and against an initiative measure might be considered by the court in determining the purpose and intent of the act." Bayha v. Pub. Util. Dist. No. 1 of Grays Harbor County, 2 Wash.2d 85, 98, 97 P.2d 614 (1939).
This voters pamphlet contained the ballot title, an explanatory statement prepared by the prosecuting attorney, and arguments for and against the proposal. The explanatory statement provided:
. . . .
RTA's Proposition 1 would implement the ten-year regional transit system plan for new rail and bus rapid transit in urban King, Snohomish, and Pierce counties.
. . . .
Electric light rail would provide all-day, frequent, two-way service to employment, retail and residential centers, including between SeaTac, Sea-Tac Airport, Tukwila, Southeast Seattle, downtown Seattle, First Hill, Capitol Hill, University District (and, if additional funding is secured, Roosevelt District and Northgate); and between downtown Tacoma and Tacoma Dome.
. . . .
The transit system would be built and operated using local taxes, federal grants, municipal bonds, and fares. A sales tax increase of four-tenths of one percent and a motor vehicle excise tax increase of three-tenths of one percent would provide the local funding, costing the average-income household about $8/month (1995 dollars). No property tax would be used.
CP at 60; see also CP at 668 (identical language for King County). Note that the areas served by light-rail and a 10-year completion date were set forth further without qualification, by a neutral party, the prosecuting attorney. See former RCW 29.81A.040(3).
Moreover, the argument for adopting the proposal assured the voters the 10-year plan was just that as it would "be finished sooner" than the 1995 16-year proposed plan the voters rejected. CP at 60; see also CP at 668 (identical language for King County). Early completion was a major selling point to seduce voter approval.
Resembling the form of the eight-page brochure, nowhere in the voters pamphlet was any indication Sound Transit planned or reserved authority to shorten the light-rail *362 line or extend its completion date for any reason. One must necessarily conclude then Sound Transit sought approval to build an electric light-rail connecting Sea-Tac to the University District and that project would be completed within 10 years. So much is plain from a textual reading of the voters pamphlet.
III. Resolution 75 Cannot Be the Measure Enacted By the Voters, But Even Assuming That It Was, It Does Not Allow Substantial Deviation From the 10-Year Commitment.
The majority neatly utilizes a creative incorporation by reference approach to find voter intent to adopt Resolution 75, the only basis for granting Sound Transit the discretion to shorten the line. Yet even if Resolution 75 were fully incorporated into the ballot titlethe only place it was even mentioned to the votersone still must conclude Sound Transit was obligated to complete the light-rail line within 10 years of voter approval as not even Resolution 75 allows for that eventuality. Nevertheless, I posit Resolution 75 was never adopted in the first place, as a matter of law.
A. Resolution 75 Was Not Adopted By the Voters.
The majority concludes, "Resolution 75 ... is the legislation adopted by the voters." Majority at 352. However, state law, statutory construction principles, and basic grammar dictate otherwise.
II. The voters pamphlet, to be lawful, must provide the text of the measure to be enacted and the text of Resolution 75 was not included.
By statute the local voters pamphlet submitted by a regional transit authority "shall include," inter alia, "[t]he text of each measure." RCW 29.81A.040, .040(3) (emphasis added); see also RCW 81.104.140(9) (mandating the local voters pamphlet comply with chapter 29.81A RCW). "Shall" is unequivocally mandatory language. Erection Co. v. Dep't of Labor & Indus., 121 Wash.2d 513, 518, 852 P.2d 288 (1993); see also Miller v. French, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (holding a contrary interpretation of "shall" "would subvert the plain meaning of the statute, making its mandatory language merely permissive").
The facts plainly show, however, Sound Transit did not include any text from Resolution 75 in the voters pamphlet. The trial court characterized this fact as a challenge to the validity of the local voters pamphlet, concluding the "full text" was not required because the statute governing the contents of a statewide voters pamphlet requires "the full text of each measure." CP at 860 (quoting RCW 29.81.250(10)). If "text" means anything short of "full text," then it must mean at least some text. But here there was no text from Resolution 75. It is simply absurd to therefore claim the text of Resolution 75, or any part thereof, need not be included in the voters pamphlet. And courts must avoid absurd results when interpreting statutes. See State v. J.P., 149 Wash.2d 444, 450, 69 P.3d 318 (2003). "Text" can mean only the actual language of the legislation to be adopted. See United States v. Nordic Vill., Inc., 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (recognizing difference between enacted text and mere legislative history); see also WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2365-66 (1981) (defining "text" as "the main body of printed or written matter on a page exclusive of headings, running title, footnotes, illustrations, or margins"). And to find ambiguity as the trial court did strains the statute in a manner this court abhors. See Kilian v. Atkinson, 147 Wash.2d 16, 20-21, 50 P.3d 638 (2002) ("A statute ... is not ambiguous simply because different interpretations are conceivable."). Moreover, local voters pamphlets must comply with the requirements of state voters pamphlets whenever the provisions of chapter 29.81 RCW apply. RCW 29.81A.010. To conclude local voters pamphlets need not provide the text of the measures proposed would render RCW 29.81A.010 meaningless.
The majority concedes the pamphlet did not contain the text of Resolution 75 but finds it sufficient that the pamphlet informed the voters where to request the text of the measure. If that were the case, the legislature has wasted taxpayer dollars by filling *363 the volumes of the Revised Code of Washington with requirements that voters pamphlets contain the "text of each measure" proposed to the voters. RCW 29.81.250(10); 29.81A.040(3). The notice requirement is simply not satisfied if the taxing authority merely provides the voters with a treasure map to find the proposed legislation.
The majority holds Resolution 75 must be the proposal enacted by the people because ballot titles "`must ... clearly identify the proposition to be voted on.'" Majority at 351 (quoting RCW 29.79.035(1)). If the majority wants to be consistent, however, it must hold the "text of [the] measure" cannot be Resolution 75 because that measure was not included in the voters pamphlet, RCW 29.81A.040(3), unless the majority claims the voters pamphlet was illegal (which it doesn't).[6]
Instructive to this analysis is Mervyn's v. Reyes, 69 Cal.App.4th 93, 81 Cal.Rptr.2d 148 (1998). There the city provided only a summary of the provision to be enacted but did not attach the actual text to the initiative petition. Id. at 97, 81 Cal.Rptr.2d 148. The California Court of Appeal invalidated the initiative petition because state law required, "`The first page of each section shall contain the title of the petition and the text of the measure.'" Id. at 99, 81 Cal.Rptr.2d 148 (emphasis in original) (quoting CAL. ELEC. § 9201). The court reasoned, "The purpose of the full text requirement is to provide sufficient information so that registered voters can intelligently evaluate whether to sign the initiative petition and to avoid confusion." Id.
Makes sense. The same reasoning applies here. Washington law requires the "text of each measure "to be included in the local voters pamphlet in order to fully apprise the electorate of the measure to be adopted or rejected. RCW 29.81A.040(3) (emphasis added). Though we have recognized the probability that not every voter reads the text of the measure proposed or the explanatory statement, In re Ballot Title for Initiative 333 v. Gorton, 88 Wash.2d 192, 198, 558 P.2d 248, 559 P.2d 562 (1977), to hold the text of a measure need not be included subverts the express legislative mandate governing voters pamphlets. What lengths the majority takes to uphold this scheme!
It is fundamental that governments have no power to divert tax dollars for a purpose other than that authorized. Thompson, 113 Wash. at 241, 193 P. 706. It logically follows then that the government must forthrightly provide all terms to which it seeks the electorate's consent. "The question is one of construction of contract, and that contract is expressed in the original ordinance. If the terms of that instrument do not permit the proposed change, then it cannot be made, regardless of the advantages which might result." Hayes, 120 Wash. at 375, 207 P. 607. Applying contract principles, we have recognized contracts are invalid where "`the important terms [are] hidden in a maze of fine print.'" Schroeder v. Fageol Motors, Inc., 86 Wash.2d 256, 260, 544 P.2d 20 (1975) (quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C.Cir.1965)). The terms Sound Transit claims were most crucial to this contract (Section 2 of Resolution 75) were hidden not just in a maze of fine print but also in a physical maze leading to the respective county auditors offices. Yet the majority circuitously approves this approach notwithstanding the flagrant lack of disclosure. Such a conclusion defies the law governing voters pamphlets designed to foster full voter awareness and open government.
As the text of Resolution 75 was not included in the voters pamphlet, it was obviously *364 not a part of it, and therefore not part of the "measure" to be adopted by the voters. Former RCW 29.81A.040.
2. Statutory construction principles mandate at most only the taxing provisions of Resolution 75 were adopted.
The majority also reasons Resolution 75 was the measure adopted by the voters because "the ballot title informed the voters that Resolution 75 was the proposal to be enacted, and the resolution was available for consideration by request to the office identified in the voters' pamphlet." Majority at 352. Even if we were to operate under the assumption the legislature did not really mean what it said by requiring "the text of each measure" to be included in the local voters pamphlet, RCW 29.81A.040(3), I still do not read the ballot title to incorporate Section 2 of Resolution 75, much less every clause thereof.
We adhere to the "fundamental precept[ ]" that any ambiguities in taxing statutes are construed "most strongly against the government and in favor of the taxpayer." Dep't of Revenue v. Hoppe, 82 Wash.2d 549, 552, 512 P.2d 1094 (1973). Hoppe considered the scope of SJR No. 1 (now amendment 55 to the state constitution), which imposed a constitutional one percent limit of true and fair value on the maximum allowable rate of regular property tax levies. Hoppe, 82 Wash.2d at 550-51, 512 P.2d 1094. We rejected the State's argument that the limitation applied only to those taxes levied after the effective date because no language in the amendment purported to restrict it to a specific time. Id. at 553, 512 P.2d 1094. Following the canon to construe legislation enacted by the people in accord with the views of the "average informed voter," we stated:
A conscientious voter who read every word of the text of SJR 1, the ballot title, the official explanation of the effect of the measure and the statement for the proposal would not find a whisper of suggestion that its impact would not be felt until 1974. We refuse to attribute to the average informed voter or even the better-than-average informed voter the legal theory that the proposed amendment hinged on the complex scheme of levying taxes in one year and collecting them in the next year, so that all taxes levied in 1972 were beyond the reach of SJR 1. If that was intended by the drafters of the measure, it would have been simple to say so.

Id. at 555, 512 P.2d 1094 (emphasis added). Our reasoning accords with the United States Supreme Court, which declared over 80 years ago:
In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the Government, and in favor of the citizen.

Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917) (emphasis added).
If we are to construe this taxing legislation literally, much less "strongly against the [g]overnment," then we must carefully examine the only reference to Resolution 75 that was given to the voters to determine which, if any, provisions of Resolution 75 were "specifically pointed out" to the voters. Id., Hoppe, 82 Wash.2d at 552, 512 P.2d 1094. The ballot title provided:
To implement a regional rail and express bus system linking Tacoma, Seattle, Bellevue, Everett, other cities, and Sea-Tac airport, shall the Regional Transit Authority impose a sales and use tax of up to four-tenths of one percent and a motor vehicle excise tax of three-tenths of one percent to provide the local share of funding towards the $3.9 billion estimated cost of the system, as provided in Resolution 75 and the "Ten-Year Regional Transit Plan"?

CP at 60 (emphasis added); see also CP at 668 (identical provision for King County). The only provision of Resolution 75 "specifically pointed out" to the voters was the imposition of sales and motor vehicle excise taxes. Even assuming some portion of Resolution 75 was incorporated, it was at most only that.
This is also compelled by the ordinary rules of grammar, such as the last antecedent *365 rule, rules both we and the United States Supreme Court employ to construe legislation. Accord Caughey v. Employment Sec. Dep't, 81 Wash.2d 597, 602, 503 P.2d 460 (1972); see also Barnhart v. Thomas, ___ U.S. ___, 124 S.Ct. 376, 380-81, 157 L.Ed.2d 333 (2003). "The last antecedent rule provides that, unless a contrary intention appears in the statute, qualifying words and phrases refer to the last antecedent." In re Sehome Park Care Ctr., Inc., 127 Wash.2d 774, 781, 903 P.2d 443 (1995).[7] The phrase "as provided in Resolution 75 and the `Ten-Year Regional Transit Plan'" in the ballot title is a qualifier which applies only to the last antecedent, namely the "impos[ition of] a sales and use tax of up to four-tenths of one percent and a motor vehicle excise tax of three-tenths of one percent to provide the local share of funding towards the $3.9 billion estimated cost of the system." CP at 60, 562. That last antecedent is set off by a comma from the purported purpose of the proposition, namely the "implement [ion of] a regional rail and express bus system linking Tacoma, Seattle, Bellevue, Everett, other cities, and Sea-Tac airport." Id. "A comma serves many functions, but its purpose always is to set a phrase apart from the rest of the sentence." E. Gig Harbor Imp. Ass'n v. Pierce County, 106 Wash.2d 707, 713, 724 P.2d 1009 (1986). Thus, the phrase "as provided in Resolution 75 and the `Ten-Year Regional Transit Plan'" applies only to that antecedent surrounded by commas, namely the increase in sales taxes and motor vehicle excise taxes. This is the most relevance the ballot title can attribute to Resolution 75, and there was no mention of the resolution in any other document provided to the voters. Had the ballot title provided language such as "Resolution 75 is incorporated in full by reference" it could at least be asserted the ballot title identified, or included by reference, portions of Resolution 75 helpful to the majority. But the ballot title did not say that, nor can the majority's argument hold water without a rewrite.
3. The ballot title could not have incorporated all of Resolution 75 because its provisions identified Proposition 1 and the Eight-Page Brochure as the proposal.
Even further negating the majority's incorporation of Resolution 75 are the terms of that Resolution itself. The majority elects to incorporate Section 2 of Resolution 75, but the ballot title makes no reference to the resolution outside the context of taxes.
To assert all of Resolution 75 was adopted means the voters must have also approved Section 6, which directs Proposition 1 to "be submitted to the voters at the general election to be held within the RTA district on November 5, 1996." CP at 415. In essence this would mean the voters elected to submit an approved measure to themselves for approval. Nonsense.[8]
Thus, the question becomes which provisions of Resolution 75, if any, were incorporated into the measure adopted by the voters? Although the real answer is none, at most the answer is guided by Gould: only those "specifically pointed out" to the voters. Gould, 245 U.S. at 153, 38 S.Ct. 53. Merely because Sound Transit internally adopted Resolution 75 does not necessarily indicate the voters also adopted it. And it is the voters whose approval is relevant. Discretionary authority to reduce the system size by one-third was never delegated to Sound Transit by the voters.
B. The Text of Resolution 75 Directly Contradicts What Was Approved by the Voters.
Even assuming the voters adopted a portion of a measure they did not see, that *366 portion cannot be squared with the language of the brochure which was sent to every voter within the RTA district. It bears repeating that if Resolution 75 is a taxing proposal to the people then it must be strictly construed against Sound Transit and in favor of the taxpayers. Hoppe, 82 Wash.2d at 552, 512 P.2d 1094.
Section 2 of Resolution 75, upon which the majority and Sound Transit rely, provides in relevant part:

In the event that the proceeds of federal contributions, plus any other moneys of the RTA legally available, are insufficient to accomplish all of the capital improvements provided by this Resolution, the RTA shall use the available funds for paying the cost of those improvements that are contained in the Ten-Year Regional Transit System Plan and are deemed by the Board to be most necessary and in the best interests of the RTA after consideration of the financial policies approved by Resolution No. 72. In the event that the Ten-Year Regional Transit System Plan improvements, or some portion thereof, are impractical to accomplish due to changed conditions or force majeure events, the RTA may use the available funds to pay principal of or interest on bonds, to reduce tax levies, or to pay for other capital and/or service improvements that achieve the stated goals of said plan, as the Board in its discretion shall determine as appropriate or necessary in accordance with law and Board policy.
CP at 415 (emphasis added). The first clause of section 2 references "insufficient funding" as a prerequisite to the discretionary authority Sound Transit has now employed. Id. That reference, however, directly contradicts the eight-page brochure's unqualified promise that Sound Transit would have more than enough money to complete the project completely and on time. See supra Part I.B. Given a choice between the government's unequivocal promise that money would be sufficient and alleged reserved discretion based on a contingency for insufficient funding, Hoppe dictates we construe the provision "most strongly against the government and in favor of the taxpayer." Hoppe, 82 Wash.2d at 552, 512 P.2d 1094.
C. Resolution 75 provides no authority to extend the completion date.
But ultimately nothing enacted nor hidden from the voters excuses Sound Transit from substantially deviating from the promised 10-year completion date. It bears repeating that we do not impute complex legal distinctions on the "average informed voter." Hoppe, 82 Wash.2d at 555, 512 P.2d 1094.
The majority reads Resolution 75 in piecemeal fashion, grasping on to section 2's grant of discretionary authority to alter the project but tossing away the pervasive references to a 10-year commitment. References within Resolution 75 to a time frame for Sound Move include those labeling the plan what it is: a "Ten-Year Regional Transit System Plan." See CP at 413 (dubbing itself as "A RESOLUTION ... calling an election to approve local taxes to implement a Ten-Year Regional Transit System Plan") (emphasis added); CP at 414 (section 1, "requir[ing] the RTA to implement the Ten Year Regional Transit System Plan" and authorizing the Board to issue bonds "in accordance with the Ten-Year Regional Transit System Plan") (emphasis added). Section 5 is even more specific:

Section 5. To ensure that the ten-year development and implementation program occurs within the framework and intent of the financial policies approved by Resolution 72, the RTA will conduct an annual comprehensive performance audit through independent audit services and appoint and maintain a citizens' oversight committee for the ten-year construction period. The oversight committee is charged with an annual review of the RTA's performance audit and financial plan and for reporting and recommendations to the Board.
CP at 415 (emphasis added).
As if this were not enough, Section 3 of that same resolution itself purported to incorporate by reference Resolution 73. That resolution was Sound Transit's adoption of "Ten-Year Regional Transit System Plan," which was formulated in response to losing *367 the election in 1995. Page 6 of Sound Transit's full plan states, in unequivocal terms:
System completion within ten years different parts and segments of the plan will be implemented in stages and be operational as soon as possible; the entire system will be completed and operational in ten years.

CP at 26 (emphasis added). Even if the voters adopted Resolution No. 75 and all of its incorporated provisions, then we must also conclude the voters adopted the 10-year language as well, and certainly did not repeal all references to 10 years in the brochure, pamphlet, and Resolution 75 itself.
The majority states, "Declarations of principles, purposes and aims are not operative rules of action and do not give rise to enforceable rights or create legal obligations." Majority at 354 (citing Melville v. State, 115 Wash.2d 34, 38, 793 P.2d 952 (1990), Int'l Union of Operating Eng'rs Local 286 v. Sand Point Country Club, 83 Wash.2d 498, 505, 519 P.2d 985 (1974), and Whatcom County v. Langlie, 40 Wash.2d 855, 863, 246 P.2d 836 (1952)). Certainly this is a correct statement of the law, adequately supported by authority. But to properly apply that rule to this case requires the majority to find promises by Sound Transit such as "the entire system will be completed and operational within ten years," CP at 26, "The ten-year timeframe for putting the plan in place begins the day after voters approve funding for the new regional transit system," CP at 45, are "merely declarations of the principles of the plan," majority at 354, and not descriptive of the plan itself. That is untenable since the 10-year construction time was offered as an express inducement to adopt this plan whereas the prior plan with a longer completion date had been rejected.
There were two fundamental changes from the 1995 proposal rejected by the voters and the 1996 proposal adopted: (1) the reduced cost and (2) the reduced time frame. See CP at 668 (local voters pamphlet stating "The new regional express plan is smaller than last year's proposal and will be finished sooner.") (emphasis added).
It is not the function of this court to decide what aspects of a ballot measure appealed to the voters. Such is contrary to our decision in George v. City of Anacortes, 147 Wash. 242, 265 P. 477 (1928), where we overturned the City of Anacortes' decision to move construction of a water main three blocks, reasoning:
[W]e think [the mere movement of the water main's location] mistakes the project as being one of several items each standing by itself, rather than one project composed of several items related to each other and endorsed and approved as a whole by the voters. There is no way of knowing just what portion of the project appealed to the voters. It may be, that the laying of the main on 20th street was considered of primary importance to a great many, and if that item had not been included they would have refused endorsement of the project.

Id. at 245, 265 P. 477 (emphasis added). Similarly, the aspect of the reduced time frame may have been "considered of primary importance" to many of the voters here, id., had Sound Transit indicated the construction might have taken 13 years as opposed to 10, the project would not have been approved. If a 33 percent decrease in the length of the line is a substantial deviation, see majority at 350 ("no disagreement" over whether 14-mile line is a substantial deviation from the promised 21-mile line), then a 30 percent increase in the time for completion is as well. As I see nothing in any measureshown to the voters or notthat grants Sound Transit the discretion to extend the time frame beyond 10 years. I would hold the government to its word just as I would hold any private person to his or her word.

CONCLUSION
Our constitution begins by declaring, "All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."CONST. art. I, § 1 (emphasis added). It is axiomatic then that when the governed consent to be taxed for a specific purpose, the government may not substantially deviate from that purpose. Accord O'Byrne, 67 Wash.2d at 136, 406 P.2d 595; *368 Thompson, 113 Wash. at 241, 193 P. 706. In 1995 the electorate rejected a 16-year time frame for a $6.9 billion light-rail line but acquiesced 1 year later to a shorter timeframe (10 years) and smaller price tag ($3.9 billion). Yet the majority now permits the taxing authority, Sound Transit, to use a 30 percent longer time than promised to construct a light-rail line one-third shorter than promised. As I fail to see how the people consented to such a deviation for all the reasons enumerated, I would reverse the trial court and order Sound Transit to seek the requisite consent if it desires to continue down this track. But it is not our role to help Sound Transit railroad the voters.
I dissent.
JOHNSON, J., concurs.
CHAMBERS, J. (dissenting).
The voters approved a 21-mile light rail line, not a 14-mile line. If the voters approved a three bridge project, would we hold that two bridges for the same price was within the scope of the voters' approval? I think not. I dissent.
I pause to lament a disturbing trend of our jurisprudence. The people have reserved unto themselves the power to legislate directly through the initiative, proposition, referendum, and resolution processes. E.g., CONST. art. II, § 1. The power of the people to legislate directly should be jealously guarded and protected by the judicial branch. However, I fear this court is failing its constitutional duty to protect the legislative role of the people by permitting inaccuracies, false representations, and clever manipulation of these processes. This court has failed its essential constitutional duty to protect the integrity of the exercise of the people's legislative power.
For example, this court has recently held that more than one subject may be included in an initiative so long as only one subject is mandatory. See Pierce County v. State, 150 Wash.2d 422, 78 P.3d 640 (2003). Thus the drafters of initiatives are invited to include promises and representations within an initiative regardless of whether or not the operative language fulfills those promises and representations.
Promotional materials may also mislead. By statute, proponents may submit language to be included in the voters' pamphlet that summarizes and explains proposed legislation. RCW 29.81.240. Voters rely upon the voters' pamphlet. But our jurisprudence prevents us from reviewing the promotional materials if the legislation is unambiguous. See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 683, 72 P.3d 151 (2003). The voters' pamphlet explanation may say something completely different from the unambiguous language in the proposed legislation. And this court has explicitly upheld the constitutional right of initiative sponsors and opponents to commit outright lies while campaigning. State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 626, 957 P.2d 691 (1998).
Courts have struck down Washington's law forbidding paid signature gatherers. Limit v. Maleng, 874 F.Supp. 1138 (W.D.Wash. 1994). It is not uncommon for signature gathers to be paid up to $2.00 per signature. See Andrew DeMillo, Your Name's Worth $1-$2 to Signature Gatherers, SEATTLE TIMES, June 27, 2000, at A1. Thus, well financed special interest groups may draft legislation, buy the signatures, and then make misleading representations in the voters pamphlet and other promotional materials, without fear of serious accountability.
I have the deepest respect and appreciation for this court's efforts to protect the vital right of freedom of expression under the First Amendment and article I, section 5 of our state constitution. However, I believe we have arrived at this constitutionally unhealthy jurisprudence primarily because this court has consistently analyzed the direct legislative authority reserved by the people unto the people the same as the legislative power given by the people to the representative branch of government.
The brilliance of our constitution may be found in its checks and balances. The initiative, referendum, proposition, and resolution processes are fundamentally different from the process engaged in by the legislative *369 branch of government. Constitutionally, one size does not fit all. Each process must be analyzed differently in terms of available checks and balances. As each process is different, the judicial branch may play a different role in each.
The right of the people to legislate directly, like the right of trial by jury, should remain inviolate.
As I read the majority, today we take another step away from our constitutional duty to protect and maintain the integrity of the people's constitutional right to legislate directly. Proponents of resolutions (and presumably other measures sent to the electorate) may incorporate other resolutions and documents by reference that give proponents almost unfettered discretion to whatever they want regardless of what the resolution submitted to the people promises to the people.
In the future this court, as intended by the checks and balances of our constitution, should fulfill its underlying constitutional role and guarantee honest, informed, and free elections. This court should protect the integrity of the people's legislative authority. Although resolutions may reference and coordinate with other laws, I would not permit resolutions submitted to the people to incorporate other resolutions by reference. Each act submitted to the people should stand on its own merit. Further, I believe that, at the very least, legislation submitted to the people must substantially comply with the representations made to the people in the voters pamphlet. I would hold that a 14-mile light rail plan substantially and materially deviates from the legislation approved by the voters. This 14-mile light rail system, in my view, must be approved by the people. Accordingly, I dissent.
NOTES
[1] According to the April 1, 2000, federal census, only four counties in Washington state have a population in excess of 400,000. WASHINGTON STATE YEARBOOK 301 (Scott D. Dwyer & Mary B. Dwyer eds., 2003). Three of them are contiguous: Snohomish, King, and Pierce. Spokane County, the fourth, does not join any of the other three counties.
[2] The project also included a 1.6 mile light rail line in downtown Tacoma. That line is essentially complete, and no issues regarding it are encompassed in this case.
[3] Sound Transit also sought a federal grant as an additional source of revenue.
[4] The voting public included those voters who reside within the boundaries of the Sound Transit district.
[5] The voters' pamphlet provided to Snohomish County voters contained a statement that "[t]he complete text of this measure may be reviewed at the Auditor's Office." CP at 60. In King County, the voters' pamphlet included a statement that "[t]he complete text of this measure may be reviewed at the Division of Records and Elections," at the bottom of the page. CP at 668. The record we have been furnished does not contain the pertinent language from the Pierce County voters' pamphlet.
[6] The percentage of votes in favor of the proposition was 56.45%. The votes against the measure totaled 406,238. The "yes" votes totaled 526, 671.
[7] In January 2001, Sound Transit found that the following unforeseen conditions and changed circumstances had occurred: "a different location and design for the light rail guideway segment and airport station in order to better serve a newly planned airport terminal; the addition of tunnel and station shell under Beacon Hill; the discovery of unstable soils beneath Portage Bay and in the vicinity of a number of the proposed underground stations; constraints based on more complete engineering and construction design information; increased right-of-way costs and construction costs; and increased environmental mitigation costs to address such issues as noise, vibration, endangered species protection, and traffic and safety impacts associated with construction in a densely populated urban environment." Decl. of Joni Earl, Ex. I at 2.
[8] Inconsistently, Justice Sanders's dissent would hold that Resolution 75 was not the legislation voted on because its text was not set forth in the voters' pamphlet, but it would hold that the eight-page summary pamphlet was the legislation voted on even though the text of the summary pamphlet was not published in the voters' pamphlet either. Dissent of Sanders, J., at 357; compare CP at 297-304 (summary pamphlet) with CP at 306-08 (voters' pamphlet).
[9] The process for challenging a local voters' pamphlet is determined by the appropriate county. RCW 29.81A.030. RCW 29.04.030 does, however, require that all challenges alleging an error in the certification of an election must be brought within 10 days of the election's certification. Therefore, a challenge to a local voters' pamphlet must be brought within 10 days of the election, if not sooner. Here, Sane Transit waited over five years after the election to bring this action.
[10] Justice Sanders's dissent disagrees and would have this court cobble together enabling legislation based only on the language used in the eight-page summary pamphlet. Resp't's Br. at 29; Dissent of Sanders, J., at 357. The dissent does not explain how the summary pamphlet contains sufficient details to be enabling legislation.
[11] Justice Sanders's dissent also contends that it is "[n]onsense" to hold that Resolution 75 is, in its entirety, the enabling legislation because section 6 requires the director to submit proposition 1, as listed in Resolution 75, section 7, to the voters. Dissent of Sanders, J., at 365. Thus, it suggests including section 6 and 7 in the enabling legislation "would mean the voters elected to submit an approved measure to themselves for approval." Id. Construing Resolution 75 against Sound Transit, as the dissent contends we must, we agree that it was unartfully drafted. The dissent's point, though, is insignificant. These two sections merely explain how the director is to seek voter approval for the other provisions of Resolution 75, and therefore, sections 6 and 7 are inoperative now and were inoperative when Resolution 75 was voted on.
[12] Sound Transit indicated its intent to construct the 14-mile light rail line beginning in 2003 and complete construction in 2009. It also committed to substantially constructing the entire 21-mile line. Should this additional construction be undertaken, it will likely be necessary for Sound Transit to extend the construction period even further.
[13] Section 5 of Resolution 75 includes the only reference to a 10-year construction period. It is stated, however, in the context of the agency's plan to maintain a citizen's oversight committee to review the agency's annual performance audit, financial plan, and to report and make recommendations to the Sound Transit Board.
[14] RCW 81.104.100(2)(d) states:

(2) High capacity transportation system planning is the detailed evaluation of a range of high capacity transportation system options, including: Do nothing, low capital, and ranges of higher capital facilities. To the extent possible this evaluation shall take into account the urban mass transportation administration's requirements....
High capacity transportation system planning shall proceed as follows:
. . . .
(d) The system plan submitted to the voters pursuant to RCW 81.104.140 shall address, but is not limited to the following issues:
(i) Identification of level and types of high capacity transportation services to be provided;
(ii) A plan of high occupancy vehicle lanes to be constructed;
(iii) Identification of route alignments and station locations with sufficient specificity to permit calculation of costs, ridership, and system impacts;
(iv) Performance characteristics of technologies in the system plan;
(v) Patronage forecasts;
(vi) A financing plan describing: Phasing of investments; capital and operating costs and expected revenues; cost-effectiveness represented by a total cost per system rider and new rider estimate; estimated ridership and the cost of service for each individual high capacity line; and identification of the operating revenue to operating expense ratio.
The financing plan shall specifically differentiate the proposed use of funds between high capacity transportation facilities and services, and high occupancy vehicle facilities;
(vii) Description of the relationship between the high capacity transportation system plan and adopted land use plans;
(viii) An assessment of social, economic, and environmental impacts; and
(ix) Mobility characteristics of the system presented, including but not limited to: Qualitative description of system/service philosophy and impacts; qualitative system reliability; travel time and number of transfers between selected residential, employment, and activity centers; and system and activity center mode splits.
[15] RCW 81.104.140(7) states, "Dedicated high capacity transportation funding sources authorized in RCW 81.104.150, 81.104.160, and 81.104.170 shall be subject to voter approval by a simple majority. A single ballot proposition may seek approval for one or more of the authorized taxing sources. The ballot title shall reference the [summary brochure sent to voters which describes the systems plan and the financing plan set forth in RCW 81.104.100]."
[16] Sane Transit also relies on Hughbanks v. Port of Seattle, 193 Wash. 498, 76 P.2d 603 (1938), and Bremerton Municipal League v. City of Bremerton, 13 Wash.2d 238, 124 P.2d 798 (1942). In Hughbanks the court prevented construction of port projects under a voter approved plan which allowed any conceivable improvement without further consideration by the voters. In this case, Sound Transit is restricted to the specific detailed plan set forth in Resolution 75 and Sound Move, and the agency may not deviate by constructing any improvement outside the scope of the approved plan. In Bremerton Municipal League, changed circumstances undermined the voters' consent to a city project. In this case, Sound Transit is limited to the actions it may take in changed circumstances, and those actions, including scaling back the project, were approved by the voters when they adopted Resolution 75. These cases, therefore, are distinguishable and do not support Sane Transit's argument.
[1] 14 miles rather than 21.
[2] 13 years rather than 10.
[3] Additionally, the House Bill Report elucidates part of the bill's purpose:

A regional HCT [high-capacity transportation] implementation program is to include a system plan, a project plan, and a financing plan. A new distinction is drawn between HCT system planning and project planning. System planning is the detailed evaluation of a range of HCT system options, including doing nothing, a low capital investment, and ranges of higher capital investments. The system planning effort is to include estimates of costs, ridership, and service levels, as well as a financing plan.
Project planning is detailed identification of alignments, station locations, equipment and systems, construction schedules, costs and environmental effects.
H.B. REP. on ESHB 2151, at 2, 52d Leg., Reg. Sess. (Wash.1991) (emphasis added).
[4] Presumably, the 25 miles reflects the originally planned route, which was seemingly shortened to allow the light-rail to travel by tunnel through Beacon Hill, rather than around the north end of Beacon Hill and into Rainer Valley. See Decl. of Joni Earl at 6. Moreover, the 25 miles included the Tacoma light-rail, which is not the subject of this appeal. Excluding this, the rail line in King County was at least 21 miles long.
[5] This notice requirement stems from our constitution which directs the legislature to:

provide methods of publicity of all laws or parts of laws, and amendments to the Constitution referred to the people with arguments for and against the laws and amendments so referred. The secretary of state shall ... make such ... distribution as he shall determine necessary to reasonably assure that each voter will have an opportunity to study the measures prior to election.
CONST. ART. II, § 1(e) (amend.72) (emphasis added).
[6] Contrary to the majority's assertion, it is not "inconsistent[ ]" to hold the eight-page brochure as enabling legislation while simultaneously rejecting Resolution 75 for not appearing in the voters' pamphlet. See majority at 352 n. 8. The eight-page brochure is required by RCW 81.104.140(8) and the local voters' pamphlet is required by RCW 81.104.140(9) and chapter 29.81 A RCW. Fundamental to statutory construction is that we construe statutes which relate to the same subject matter in pari materia, or in other words, as if they were one statute. See Hallauer v. Spectrum Props., Inc., 143 Wash.2d 126, 146-47, 18 P.3d 540 (2001). Reading RCW 81.104.140(8)-(9) together with RCW 29.81A.040(3), it is clear that a high-capacity transit authority does not violate either statute when it mailed the brochure in addition to the voters pamphlet. Rather, it complied with these statutes.
[7] Though a corollary to the last antecedent rule provides "the presence of a comma before the qualifying phrase is evidence the qualifier is intended to apply to all antecedents instead of only the immediately preceding one," In re Sehome Park Care Ctr., Inc., 127 Wash.2d 774, 781-82, 903 P.2d 443 (1995), the multiple antecedents relevant to the qualifier in the ballot title are (1) the sales tax and (2) the motor vehicle excise tax.
[8] If this merely means Sound Transit "unartfully drafted" Resolution 75, majority at 352 n. 11, it is contrary to precedent to give Sound Transit the benefit of the doubt as the majority does. See Hoppe, 82 Wash.2d at 552, 512 P.2d 1094 (we construe taxing statutes against the government).