IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| JOHN LEY; WILLIAM CISMAR; DAN COURSEY; MARK ENGELMAN; CARL GIBSON; TOM HANN; JOHN JENKINS, SHARON LONG; LARRY MARTIN; GREG NOELCK; HARVEY OLSON; LARRY PATELLA; BRIAN PECK; BRIAN PEABODY; FRAN RUTHERFORD; GARY SCHAEFFER; TOM SHARPLES; CHARLES STEMPER; and DON YINGLING, | No. 48715-2-II |
| Appellants, | |
| v. | PUBLISHED OPINION |
| CLARK COUNTY PUBLIC TRANSPORTATION BENEFIT AREA, a Washington Public Transportation Benefit Area, | |
| Respondent. | |

MAXA, A.C.J. – The board of directors of the Clark County Public Transportation Benefit

Area (C-TRAN) adopted resolutions in 2005 and 2011 that proposed ballot measures authorizing

an increase in sales and use taxes available to C-TRAN to fund public transportation. Voters

passed both ballot measures. In 2012, C-TRAN's board approved a $53 million Fourth Plain

Bus Rapid Transit (BRT) project, which is designed to provide more efficient bus service along

Fourth Plain Boulevard between downtown Vancouver and Westfield Vancouver Mall.

Revenues from the 2005 and 2011 tax measures potentially were available to fund C-TRAN's share of the BRT project.

John Ley and other taxpayers in the transit area (collectively Ley) filed suit against C-TRAN, alleging that using revenues from the 2005 and 2011 ballot measures for the BRT project would violate article VII, section 5 of the Washington Constitution. Article VII, section 5 states that "every law imposing a tax shall state distinctly the object of the same to which only it shall be applied." The trial court granted summary judgment in favor of C-TRAN and dismissed the lawsuit.

Ley appeals the trial court's summary judgment order. He argues that revenue from the 2005 and 2011 ballot measures cannot lawfully be used to fund the BRT project because (1) the enabling resolutions for the tax measures stated that the purpose of the increased taxes was to fund specific public transportation plans not including the BRT project, and (2) using the tax revenues to fund the BRT project would represent a substantial deviation from funding those specific plans. C-TRAN argues that the enabling resolutions for the ballot measures stated that that the purpose of the increased taxes was more generally to fund the preservation of local service levels and that the BRT project will preserve service levels along the Fourth Plain corridor.

We hold that C-TRAN can lawfully use the revenue from the 2005 and 2011 ballot measures to fund the BRT project because that project is consistent with the goals of the tax measures as stated in the enabling resolutions – to preserve local transit service. Accordingly, we affirm the trial court's grant of summary judgment in favor of C-TRAN.

FACTS

C-TRAN is a public transportation benefit area that was organized in 1980 pursuant to chapter 36.57A RCW. C-TRAN's service area includes the cities of Vancouver, Washougal, Camas, Battle Ground, Ridgefield, and La Center; the town of Yacolt; transportation corridors connecting the city limits of Battle Ground, Ridgefield, La Center, and Yacolt; and the unincorporated areas surrounding Vancouver.

C-TRAN is funded in part by retail sales and use taxes. At its inception in 1980, voters approved a tax measure allowing C-TRAN to impose a 0.3 percent sales tax. In 1999, C-TRAN lost state matching funds that represented a significant portion of its annual budget. As a result, C-TRAN cut back services in 2000.

*2005 Tax Measure*

In 2005, C-TRAN's board passed resolution BR-05-021 (2005 resolution) in an effort to address its reduced funding and service cutbacks. This resolution requested that the Clark County auditor place a ballot measure on the 2005 election ballot authorizing the imposition of "an additional 0.2 percent sales and use tax for the purpose of funding C-TRAN's Service Preservation Plan, which preserves current service levels and restores innovative services to areas that lost service in 2000." Clerk's Papers (CP) at 1282. The 2005 resolution also asked the auditor to consider specific ballot language, which stated that the tax increase was "to preserve C-TRAN local fixed route, commuter, and demand response service" in Vancouver and certain areas and restore service to other areas. CP at 1283.

The ballot measure placed on the ballot was identical to the language proposed in the resolution. The voters' pamphlet sent to voters contained the ballot measure, the full text of the

2005 resolution, and statements for and against the ballot measure. The voters approved the ballot measure providing for the 0.2 percent tax increase in the 2005 election.

*2011 Tax Measure*

In 2011, C-TRAN again faced financial difficulties in part due to the recession. C-TRAN's board passed resolution BR-11-004 (2011 resolution). This resolution requested that the Clark County auditor place a ballot measure on the 2011 election ballot authorizing the imposition of "an additional 0.2 percent of the sales and use tax available to [C-TRAN] for the purpose of funding a Core Bus and C-Van Preservation Ballot Measure." CP at 458. The 2011 resolution also asked the auditor to consider specific ballot language, which stated that the tax increase was "to preserve C-TRAN local fixed route, limited, commuter and Connector service" in Vancouver and certain areas and to meet the current and projected growth for paratransit service. CP at 458.

The ballot measure placed on the ballot was identical to the language recommended in the resolution. The voters' pamphlet sent to voters contained the ballot measure, the full text of the 2011 resolution, and statements for and against the ballot measure. The voters approved the ballot measure providing for the 0.2 percent tax increase in the 2011 election.

*BRT Project*

In 2012, C-TRAN's board passed resolution BR-12-006, which supported the BRT project. The BRT project is intended to address transit needs along the Fourth Plain corridor in Vancouver. The project will replace Fourth Plain bus routes 4 and 44 with a new route for 5.9 miles between downtown Vancouver and the Westfield Vancouver Mall. The BRT route will use longer buses, operate with greater frequency, and include other improvements. Other

existing fixed routes that travel near the BRT route will be modified to better complement the BRT route. The net result of the project will be to reduce travel time between the two areas by up to 10 minutes.

The BRT project will require the purchase of 10 new buses that are longer than the current buses used. The project also will involve upgrades to existing stations to allow level boarding for those in wheelchairs to board easily. Other features of the BRT project are ticket machines at every station, transit signal priority, and additional bus bays. The total estimated cost of the BRT project is $53,120,000. C-TRAN's actual cost will be $7.4 million, with the remaining funds coming from state and federal grants.

In 2014, C-TRAN's board approved allocating most of its financial contribution to the BRT project from C-TRAN's uncommitted cash and investment reserves. The record does not clearly indicate whether C-TRAN actually has used revenues from the 2005 and 2011 tax measures to fund the BRT project.[1]

*Challenge to BRT Spending*

In December 2014, Ley filed a lawsuit against C-TRAN, seeking declaratory relief that revenue from the 2005 and 2011 tax measures could not be spent on the BRT project.[2] C-TRAN moved for summary judgment. The trial court granted summary judgment in favor of C-TRAN.

---

[1] The Department of Revenue provides C-TRAN with one lump payment per month reflecting the total 0.7 percent sales and use tax revenue without segregating funds based on the different propositions. C-TRAN has not segregated the funds received from the different tax measures.

[2] Ley's complaint also asserted that (1) the BRT project violated statutes governing high capacity transportation systems, (2) the BRT project was ultra vires, and (3) taxpayers were entitled to an equitable accounting of C-TRAN. Ley does not address these claims on appeal.

Ley appeals the trial court's summary judgment order.

ANALYSIS

A.    STANDARD OF REVIEW

1.    Summary Judgment Standard

We review a trial court's order granting summary judgment de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We review the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Keck*, 184 Wn.2d at 370.

2.    Interpretation of Tax Measures

Ley and C-TRAN disagree over the appropriate standards governing review and interpretation of the tax measures. Ley argues that we should apply the principles of contract construction, relying on *Sane Transit v. Sound Transit*, 151 Wn.2d 60, 69, 85 P.3d 346 (2004) (stating without analysis that interpreting an enabling resolution for a proposition approved by voters is a question of contract construction). C-TRAN argues that we should apply principles of statutory interpretation, relying on the general rule that courts apply "the same rules of statutory construction to municipal ordinances as to state statutes." *City of Wenatchee v. Owens*, 145 Wn. App. 196, 202, 185 P.3d 1218 (2008). As a practical matter, the standard we use makes little difference in this case because both require us to look to the plain meaning of the language used.

The primary objective in contract interpretation is to ascertain the parties' intent, which we determine by focusing on the reasonable meaning of the contract language. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712-13, 334 P.3d 116 (2014). We give words

their ordinary, usual, and popular meaning unless the agreement clearly demonstrates a different intent. *Id.* at 713. If the contract language is clear and unambiguous, we must enforce the contract as written. *RSD AAP, LLC v. Alyeska Ocean, Inc.*, 190 Wn. App. 305, 316, 358 P.3d 483 (2015), *review denied* 185 Wn.2d 1023 (2016).

Similarly, the purpose of statutory interpretation is to determine and give effect to the enacting body's intent. *Gray v. Suttell & Assocs.*, 181 Wn.2d 329, 339, 334 P.3d 14 (2014). To determine intent, we first look to the plain language of the statute, considering the text of the provision, the context of the statute, related provisions, and the statutory scheme as a whole. *Id.* If a statute is unambiguous, we apply the statute's plain meaning as an expression of intent without considering other sources of such intent. *Jametsky v. Olsen,* 179 Wn.2d 756, 762, 317 P.3d 1003 (2014).

3.    Construction of Ambiguities in Tax Measures

Ley also argues that we must construe any ambiguity in the resolution language against C-TRAN. Ley cites various cases to support the general proposition that ambiguity in a taxing statute is construed against the taxing power and in favor of the taxpayer. *In re Estate of Bracken*, 175 Wn.2d 549, 563, 290 P.3d 99 (2012); *Dep't of Revenue v. Hoppe*, 82 Wn.2d 549, 552, 512, P.2d 1094 (1973).

However, the cases Ley cites differ from this case because they all involve the *collection* of taxes from taxpayers, and not a public entity's *expenditure* of taxes that already have been collected.[3] Ley has not provided any authority that ambiguities must be construed in favor of the

_____

[3] Ley does not challenge C-TRAN's collection of the taxes relating to the 2005 and 2011 tax measures.

challenging party in tax expenditure cases. Therefore, we do not construe any ambiguities in favor of Ley and against C-TRAN.

B.    LEGAL PRINCIPLES

1.    Constitutional Requirements for Taxes

Article VII, section 5 of the Washington Constitution states that no tax can be levied unless authorized by law and that "every law imposing a tax shall state distinctly the object of the same *to which only it shall be applied*." (Emphasis added.) The "state distinctly" requirement is directed to the relationship between the tax and the purpose of the tax. *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 804, 123 P.3d 88 (2005). An action is unconstitutional if it diverts taxes assessed for purposes stated in the enabling law into some "wholly unrelated project or fund." *Id.*

"When voters approve taxes for a public project, major deviations to the project are not within the government's lawful power." *Larson v. Seattle Popular Monorail Auth.*, 156 Wn.2d 752, 765, 131 P.3d 892 (2006). "While minor details in a public project may be changed by the governing agency, taxpayer funds may not be used to construct a substantially different project than the one approved by voters." *Sane Transit*, 151 Wn.2d at 68. However, a substantial deviation is lawful if the enabling legislation for the tax measure authorizes the public entity to make such a deviation. *Id.* at 69.

2.    Enabling Legislation

When a tax is imposed by proposition, the starting point for applying article VII, section 5 is identifying the law imposing the tax. *See id.* The Supreme Court in *Sane Transit* held that the relevant law was the resolution enabling the ballot measure. *Id.* at 69, 72-73.

8

In *Sane Transit*, the court was faced with determining whether Sound Transit's acknowledged substantial deviation from its approved light rail plan was permitted by the enabling legislation. *Id.* at 69. The substantial deviation was Sound Transit's decision to shorten the proposed light rail route and to take longer than 10 years to complete the project. *Id.* at 68-69.

The court first had to determine what document constituted the enabling legislation imposing the tax. *Id.* at 69-71. Sound Transit had passed resolution 75, which authorized a ballot measure seeking a tax increase to implement a regional rail and express bus system as provided in the Sound Move plan. *Id.* at 64-65. The voters received a pamphlet titled "Sound Move: The Ten-Year Regional Transit System Plan," which summarized the 36-page Sound Move plan. *Id.* at 65. The voters also received a voters' pamphlet that included the ballot measure, an explanatory statement, and statements for and against the measure. *Id.* The voters' pamphlet noted that voters could review the complete text of resolution 75 at the county auditor's office. *Id.*

The court held that resolution 75 was the enabling legislation, not the Sound Move pamphlet, ballot measure, or voters' pamphlet. *Id.* at 69, 71-73. Because resolution 75 was the enabling legislation and it contained a clause granting Sound Transit discretion to modify the light rail plan, the court held that Sound Transit's substantial deviation was permitted. *Id.* at 81-82. The court noted that although the Sound Move pamphlet sent to voters stated repeatedly that the project would take 10 years to complete, those statements were simply "[d]eclarations of principles, purposes, and aims" and "not operative rules of action and do not give rise to enforceable rights or create legal obligations." *Id.* at 76.

Here, under article VII, section 5 we must compare the purposes of the 2005 and 2011 tax

measures as stated in the enabling resolutions with the details of the BRT project. We then must

determine whether the BRT project falls within the stated purpose that voters approved or is a

substantial deviation from that purpose.

C.      2005 TAX MEASURE

The parties agree, based on *Sane Transit*, that the 2005 resolution is the enabling

legislation that we examine to determine the purpose of the 2005 tax measure. *Id.* at 69, 72-73.

Under article VII, section 5, revenues from the 2005 tax measure must be applied only to the

object of that tax as stated in the resolution.

Ley and C-TRAN disagree over the "object" of the tax measure as expressed in the 2005

resolution. Ley argues that the resolution's purpose is specifically to fund C-TRAN's Service

Preservation Plan and that the BRT project represents a substantial deviation from that plan. C-

TRAN argues that the purpose is more generally to fund the preservation of current transit

service levels and that the BRT project is consistent with preservation of service.

We hold that the purpose of the 2005 tax measure was to fund C-TRAN's Service

Preservation Plan in order to achieve the broader goal of preserving C-TRAN's current service

levels. And we hold that the BRT project is consistent with that purpose.

1.      Resolution Language

The 2005 resolution contained an introductory clause, seven "whereas" clauses, and three

resolution clauses. The introductory clause stated that the purpose of the 2005 resolution was to

authorize a request that the county auditor place on the ballot "a proposition which authorizes the

imposition of up to an additional 0.2 percent of the sales and use tax available to [C-TRAN] *for*

10

*the purpose of funding a Service Preservation Plan*." CP at 1282 (emphasis added). One whereas clause stated that C-TRAN's board of directors had "approved a Service Preservation Plan that *preserves current service levels* and restores innovative services to areas that lost service in 2000." CP at 1282 (emphasis added).

The first resolution clause stated:

> NOW, THEREFORE BE IT RESOLVED by the C-TRAN Board of Directors that a proposition be placed on the September 20, 2005 primary ballot, authorizing the imposition of up to an additional 0.2 percent sales and use tax *for the purpose of funding C-TRAN's Service Preservation Plan*, which *preserves current service levels* and restores innovative services to areas that lost service in 2000, including the cities of La Center and Ridgefield, the Town of Yacolt, and the Washington State University Vancouver campus.

CP at 1282 (emphasis added). The second resolution clause asked the Clark County auditor to consider specific ballot language:

> C-TRAN, Clark County Public Transportation Benefit Area Authority, in adopting Resolution #BR-05-021, authorizes a proposition to increase the sales and use tax by 0.2 percent, or two cents on a $10.00 purchase, *to preserve C-TRAN local fixed route, commuter, and demand response service* (C-VAN and the Camas Connector) in the City of Vancouver and its urban growth boundary, and the city limits only of Camas, Washougal, and Battle Ground; and to restore service to the cities of La Center and Ridgefield, the Town of Yacolt, and the WSU - Vancouver campus.

CP at 1283 (emphasis added).

The third resolution clause directed C-TRAN staff to provide to citizens of Clark County (1) a document that "describes the services included in the Service Preservation Plan, which preserves current transit service and restores services lost to areas in 2000"; and (2) information about a Service Reduction Plan that would be implemented if voters rejected the proposition. CP at 1283.

2. Purpose of 2005 Resolution

The introductory clause and the first resolution clause of the 2005 resolution stated that the tax measure's purpose was to fund a specific transportation plan – the Service Preservation Plan. In addition, the third resolution clause directed that the Service Preservation Plan be distributed to the citizens of Clark County. The Service Preservation Plan clearly was a focus of the 2005 resolution.

On the other hand, the ballot language C-TRAN proposed in the 2005 resolution did not mention the Service Preservation Plan. The proposed ballot language – which was identical to the ballot measure the voters approved – stated that the tax measure's purpose was to "preserve C-TRAN local fixed route, commuter, and demand response service." CP at 1283. And the first resolution clause stated that the purpose of the tax increase was to fund "C-TRAN's Service Preservation Plan, *which preserves current service levels*." CP at 1282 (emphasis added). A whereas clause included the same description of the Service Preservation Plan. The language of these provisions suggests that the one of the 2005 resolution's primary goals was the preservation of current service levels and that the Service Preservation Plan was the specific plan designed to implement that goal.

We must interpret the language of the 2005 resolution as a whole. *Gray*, 181 Wn.2d at 339 (statutory interpretation); *Viking Bank*, 183 Wn. App. at 713 (contract interpretation). Further, we interpret statutes and contracts to give effect to all the language used and without rendering any portion meaningless. *Veit v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 113, 249 P.3d 607 (2011) (statutory interpretation); *Snohomish County Public Trans. Benefit Area Corp. v. FirstGroup Am., Inc.*, 173 Wn.2d 829, 840, 271 P.3d 850 (2012) (contract

interpretation). Here, these principles mean that the Service Preservation Plan cannot be viewed in isolation from the goal of that plan as stated in the 2005 resolution.

We interpret the 2005 resolution to give effect to both its specific purpose, to fund the Service Preservation Plan, and its broader goal, to preserve current transit service levels. Therefore, we hold that an unambiguous purpose of the 2005 tax measure was to fund C-TRAN's Service Preservation Plan in order to achieve the goal of preserving current service levels.

3. Consistency with 2005 Resolution's Purpose

Ley argues that funding the BRT project is a substantial deviation from the purpose of the tax increase that voters approved in the 2005 tax measure. We disagree.

Ley argues that neither the 2005 resolution nor the Service Preservation Plan authorized C-TRAN to use revenue from the tax measure to fund a significant capital project like the BRT project. Because the 2005 resolution's purpose involved both funding the plan and preserving of transit service, we must analyze the issue from both perspectives.

a. Service Preservation Plan

Whether funding the BRT project constitutes a substantial deviation from funding the Service Preservation Plan depends on the scope and provisions of that plan. The Service Preservation Plan was a relatively short (13 pages including attachments) staff report that emphasized C-TRAN's ability to finance its current operations without running a deficit. The plan focused on two major principles: (1) "[preserving] current transit service levels" and (2) restoring service lost in 2000 in certain areas. CP at 1286.

Significantly, the Service Preservation Plan was goal specific rather than project specific.[4] The plan did not outline any specific construction projects. Instead, it was "a new service and funding plan that preserve[d] transit service levels and balance[d] C-TRAN's budget." CP at 1285. As stated in the 2005 resolution, the clear goal of the plan was to preserve local transit service levels while adding voter-approved tax revenue to fund those levels.

The plan proposed almost no changes to urban bus routes. But it required C-TRAN to "achieve high service performance standards." CP at 1286. And the plan assumed that C-TRAN would make "[s]ervice efficiencies and ridership improvements each year beginning 2007 with specific service performance standards identified for each service type." CP at 1287. Finally, the plan's description of fixed route service provided that "[l]ocal fixed route service standards will be consistent with the goals set by the Board of Directors." CP at 1287. These excerpts indicate that the plan anticipated that C-TRAN would implement some improvements to maintain a properly functioning system in order to serve the plan's first major principle of preserving service levels.

Ley emphasizes that the Service Preservation Plan did not identify any substantial capital improvements. But the plan did reference capital projects, stating that the "Service Preservation Plan capital requirements are addressed in the Prioritized Capital Projects List approved by the Board in March 2004." CP at 1292. That list of capital projects is not in the record. However, nothing in the plan suggests that it would preclude C-TRAN from initiating any capital projects in order to preserve local service.

---

[4] The nature of the plan is one of the distinguishing factors between this case and *Sane Transit*, in which the tax measure was designed to fund a specific project. 151 Wn.2d at 64-65.

Ley also argues that the plan did not contemplate a capital project with the scale and cost of the BRT project. But the plan included a spread sheet that provided income and expenditure projections, which included a line for "Capital Local Share." CP at 1295. C-TRAN projected capital expenditures in this category of over $8.8 million in 2005, over $9 million in 2006, and over $13.5 million in 2011. All of these projections exceed C-TRAN's $7.4 million capital share for the BRT project. Therefore, the plan arguably did contemplate capital expenditures similar to those that C-TRAN will incur for the BRT project.

We hold that funding the BRT project is not inconsistent with the Service Preservation Plan. Therefore, the ultimate issue is whether the BRT project falls within the plan's general goal of preserving current transit service levels.

> b.      Preserving Current Service Levels

Ley argues that even if the purpose of the 2005 resolution was generally to preserve current service levels, the BRT project was a substantial deviation from that purpose. In response, C-TRAN argues that "preserving" current service levels necessarily includes some changes and improvements to maintain the level of service. C-TRAN claims that the BRT is necessary to preserve the current level of service on Vancouver's busiest corridor. We agree with C-TRAN.

First, Ley argues that there are questions of fact regarding whether the BRT project relates to service preservation. This argument turns in part on the issue of whether "preservation" can include making necessary improvements to a system to maintain current service levels.

15

No. 48715-2-II

The dictionary definition of "preserve" includes "to keep safe from injury, harm, or destruction" and to "protect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1794 (2002). Under this definition, preserving a system does not merely contemplate taking no action and spending no money as a system declines or becomes less efficient. Maintaining the status quo necessarily includes pursuing new projects that will keep the system running at current levels. For example, C-TRAN points out that replacing an outdated bus may be necessary to preserve current service levels. Therefore, the 2005 resolution cannot be interpreted as requiring C-TRAN to keep the fixed route service exactly as it was in 2005. And in fact, Ley acknowledged at oral argument that preserving service includes expenditures for new buses and other improvements.

Here, in adopting the BRT project C-TRAN noted that Fourth Plain Boulevard "is Clark County's highest ridership corridor; with bus overcrowding becoming more common, coupled with diminishing trip reliability and increasing transit travel times." CP at 26. C-TRAN projected an increase of demand of up to 40 percent through 2035 because of projected population and job growth. Such growth would "overtake C-TRAN's ability to adequately serve the Fourth Plain Corridor with existing bus service." CP at 26. It follows that if C-TRAN did not improve the Fourth Plain routes, the level of fixed route service on the Fourth Plain corridor would decline.

The BRT project's purpose and need statement provided that the purpose of the project was to:

16

cost-effectively increase transit ridership as well as enhance transit's comfort, convenience and image by reducing transit travel time, improving trip reliability, and increasing transit capacity to meet current and long-term transit travel demand, while also enhancing the safety and security of the corridor.

CP at 27. To achieve the purpose of preserving fixed route service along the Fourth Plain corridor, C-TRAN decided to make the improvements that comprise the BRT project.

The record shows that the BRT project intends to improve transit along the Fourth Plain corridor in order to prevent overcrowding, which will prevent harm to that bus route and protect the efficient operation of that route. Therefore, the record is sufficient to establish that the BRT project is consistent with preserving current service along the Fourth Plain corridor.

Second, Ley argues that the BRT project's cost and scale are inconsistent with preservation. As noted above, Ley acknowledges that preserving service includes expenditures for new buses and other improvements. But he argues that the term "preserve" cannot include the expenditure of millions of dollars for the largest capital project in C-TRAN's history. However, whether a project is designed to preserve something cannot depend on the cost of the project. As C-TRAN points out, projects designed to restore damaged transit infrastructure after a natural disaster – regardless of how costly – obviously would fall within the meaning of preserving service levels.

The 2005 resolution places no spending limits on furthering its goal of preserving current service levels. As noted above, the Service Preservation Plan projected future annual capital expenditures that were greater in some years than C-TRAN's $7.4 share of the BRT project. Therefore, we reject Ley's argument that the cost of the BRT project necessarily means that it is a material deviation from the purpose of the 2005 resolution.

17

c.    Summary

We hold that funding the BRT project is consistent with the 2005 resolution's purpose of funding C-TRAN's Service Preservation Plan in order to achieve the goal of preserving current service levels.  Therefore, we hold that C-TRAN is able to lawfully use revenue from the 2005 tax measure to fund the BRT project.

D.    2011 TAX MEASURE

The parties agree, based on *Sane Transit*, that the 2011 resolution is the enabling legislation that we examine to determine the purpose of the 2011 tax measure.  151 Wn.2d at 69, 72-73.  Under article VII, section 5, revenues from the 2011 tax measure must be applied only to the object of that tax as stated in the resolution.

Ley and C-TRAN disagree over the "object" of the tax measure as expressed in the 2011 resolution.  Ley argues that the resolution's purpose is specifically to fund the Core Bus and C-VAN Preservation Plan and that the BRT project represents a substantial deviation from that plan.  C-TRAN argues that the purpose is more generally to fund the preservation of local fixed route service and that the BRT project is consistent with preservation of service.

We hold that the purpose of the 2011 tax measure was to preserve C-TRAN's local fixed route transit service.  And we hold that the BRT project is consistent with that purpose.

1.  Resolution Language

The 2011 resolution consisted of an introductory clause, 11 whereas clauses, and two resolution clauses.  The introductory clause stated:

> A RESOLUTION REQUESTING the Clark County Auditor to place on the November 8, 2011 general election ballot, a proposition which authorizes the imposition of up to an additional 0.2 percent of the sales and use tax available to the Clark County Public Transportation Benefit Area (C-TRAN) *for the purpose of funding a Core Bus and C-VAN Preservation Ballot Measure*.

CP at 458 (emphasis added). One whereas clause stated that C-TRAN's board "determined that a 0.2 percent sales and use tax increase will preserve C-TRAN's existing local fixed route, limited, commuter and connector service." CP at 458. None of the whereas clauses referenced a specific plan to be funded.

The first resolution clause asked the Clark County auditor to consider specific ballot language:

> C-TRAN . . . in adopting Resolution BR-11-004, authorizes a proposition to increase the sales and use tax by 0.2 percent, or two pennies on a ten dollar purchase, *to preserve C-TRAN local fixed route, limited, commuter and Connector service* in the City of Vancouver and its 2005 Urban Growth Boundary, and the city limits only of Camas, Washougal, Battle Ground, La Center, Ridgefield, and the town of Yacolt; and to meet the current and projected growth for Paratransit service, C-VAN.

CP at 458 (emphasis added). The second resolution clause directed C-TRAN staff to disseminate a description of services in the Core Bus and C-VAN Preservation Plan.

2. Purpose of 2011 Resolution

Unlike the 2005 resolution, the 2011 resolution did not state that the purpose of the 2011 tax measure was to fund a specific plan. The 2011 resolution's introductory clause stated that the purpose of the tax measure was to fund the "Core Bus and C-VAN Preservation *Ballot Measure*," not the plan itself. CP at 458 (emphasis added). The whereas clauses did not mention the plan, and instead referenced the general goal of preserving local service. The proposed ballot language – which was identical to the ballot measure the voters approved – stated that the tax

19

increase in part was "to preserve C-TRAN local fixed route . . . service" in Vancouver and other areas without referencing any specific plan. CP at 458.

The second resolution clause did mention a Core Bus and C-VAN Preservation Plan. But it did not state that the purpose of the tax increase was specifically to fund that plan. Instead, the resolution language made it clear that the plan was one of the means by which C-TRAN hoped to achieve its goal of preserving local fixed route service.

We hold that the purpose of the 2011 tax increase was to fund the ballot measure, and the unambiguous purpose of the ballot measure was to preserve C-TRAN's local fixed route service.

3.    Consistency with 2011 Resolution's Purpose

As with the 2005 tax measure, Ley argues that even if the purpose of the 2011 resolution was generally to preserve C-TRAN's local fixed route service, the BRT project was a substantial deviation from that purpose. We already analyzed and rejected this argument in discussion of the 2005 tax measure. We hold that funding the BRT project is consistent with the 2011 resolution's purpose of preserving C-TRAN's local fixed route service. Therefore, we hold that C-TRAN is able to lawfully use revenue from the 2011 tax measure to fund the BRT project.[5]

---

[5] Ley requested his attorney fees on appeal based on the common fund doctrine. However, we do not address that issue because we hold that C-TRAN can use both the 2005 and 2011 tax measure revenues to fund the BRT project and therefore Ley did not create a common fund.

No. 48715-2-II

CONCLUSION

We hold that C-TRAN's use of revenues from the 2005 and 2011 tax measures would not violate article VII, section 5 of the Washington Constitution. Accordingly, we affirm the trial court's grant of summary judgment in favor of C-TRAN.

MAXA, A.C.J.

We concur:

WORSWICK, J.

MELNICK, J.

21